Ann **FLUKINGER**, et al., Appellants,

v.

William J. **STRAUGHAN**, et al., Appellees.

No. C14–87–00885–CV.

Court of Appeals of Texas, Houston (14th Dist.).

June 28, 1990.

Rehearing Denied Aug. 9, 1990.

W.R. Malone, Huntsville, for appellants.

Robert A. Plessala, Thomas C. Swinnea, William K. Wilde, Mark E. Lowes, Houston, William M. Parrish, Austin, Laura A. Einspanier, Dallas, for appellees.

Before PAUL PRESSLER, CANNON and ELLIS, JJ.

## OPINION

CANNON, Justice.

Appellants Ann Flukinger, Birdie Hilsher Pech and Lorraine and Victor Krutilek filed suit to cancel a sand and gravel lease. Following a jury trial, the trial court awarded a take nothing judgment against them but awarded defendants damages on their counterclaims. On appeal, we modify the judgment to delete $102,744.62 from the award of actual damages to Chambco, Inc. We further modify the judgment to delete the award of actual damages and attorney fees to Walter Riddle. Appellees are William Straughan, Walter Riddle, SRS Enterprises, Inc., Chambco, Inc., Dunbar Chambers, Jr., John Green, North Side Bank and Robert Lehman.

Ann Flukinger, Birdie Hilsher Pech and Lorraine Krutilek are sisters. Victor Krutilek is Lorraine's husband. In 1979 they executed an agency agreement with Mrs. Pech's sons, Robert and William Hilsher, for the purpose of negotiating the sale of gravel leases on property they own in Fayette County. The agreement contained the following paragraph:

WHEREAS, Agent shall not have authority until it is specifically conferred upon Agent in writing by Owner to obligate Owner to execute any lease for any purpose or to make any contracts or undertakings on Owner's behalf without Agent's having first received prior approval of Owner.

Robert Hilsher handled most of the leasing activity as his brother was occupied with the administration of their father's estate. By May he had negotiated a lease with SRS Enterprises, Inc. ("SRS") and its owners Walter Riddle, William Straughan and Floyd Skeen, which he and his brother signed.

There is evidence that appellants knew of the lease and knew their agents had signed it. Furthermore, Mrs. Pech helped show the property to Floyd Skeen; she allegedly told Walter Riddle that her sons were her agents and were to take care of the details of the lease; and, after discussion with her sisters and brother-in-law, she told her sons to accept SRS's offer. Appellants did not sign the lease, however, and they maintain they did not see it until September. Ann Flukinger testified that they were unhappy with a clause in the lease stating that the Hilsher brothers, "as Agents, are authorized to act in behalf of and bind Lessors as set out herein." They therefore sent a notice to the Hilshers reiterating that the lease was not to be assigned without their written consent nor used as collateral for financing the sand and gravel operation. However, they did not notify SRS that they considered the lease invalid without their signatures.

Section X of the lease prohibited its assignment without the lessors' written consent. However, on May 31, 1979, SRS and its three owners borrowed money from Republic Bank of San Antonio to finance their mining operation and assigned the lease to the bank as security for the loan. Robert and William Hilsher gave their written consent to this assignment on June 4th.

Chambco, Inc., had a sand mining operation on the Brazos River and needed a source of gravel to market with its sand. Its owner, Dunbar Chambers, learned about the SRS operation and arranged to buy gravel from the plant. When it became clear that SRS could not produce the amount of material originally anticipated, Chambco helped with expertise and financing. Chambers also introduced the SRS people to North Side Bank, where he was a director, and on July 10th, SRS obtained a loan from the bank. As part of the loan, Republic Bank of San Antonio was paid and its rights assigned to North Side Bank. The loan was also secured by a deed of trust and security agreement. These documents were submitted to Robert and William Hilsher for approval. William Hilsher gave his written approval but testified that he later rescinded it.

Appellants were aware that some kind of mining operation was being conducted on their property, and they accepted and cashed royalty checks from May through December. When they found out about the assignments of the lease, they became concerned that the property itself was encumbered and met with Robert Lehman at North Side Bank. Lehman told them of Chambco's involvement with SRS. Appellants met several times with Chambers and Chambco president John Green and indicated that they wanted Chambco to replace SRS on the property because they felt that SRS was not accounting for all of the gravel removed. In reliance on what Chambers and Green perceived to be a promise of a new lease or an assignment of the SRS lease, Chambco ordered equipment to improve the mining operation. At the bank's request, Chambco also paid off the SRS note to North Side Bank, and on November 26th, the SRS principals assigned the sand and gravel lease to Chambco.

After somewhat confusing negotiations, appellants decided not to execute a new

lease or assign the old one but instead filed a suit to cancel the existing lease. Chambco and Walter Riddle filed counterclaims. By agreement of the parties, a jury trial was waived on the issues of the amount of material removed from the property and its market value, and those issues were tried to a special master. The remaining issues were tried to a jury. The jury found against appellants on their affirmative claims and for appellees on all their affirmative defenses. The jury further found that appellants were estopped to make any complaint as to the actions of any appellee and had waived any claims they might have had. Chambco was awarded actual and exemplary damages on its counterclaim for fraud; Walter Riddle was awarded damages and attorney fees on his counterclaim for breach of lease; and Lehman and the bank were awarded attorney fees on their DTPA bad faith claim.

The parties stipulated to the following facts, some of which have been discussed above:

1. The land in dispute consists of approximately 374 acres. It is composed of two (2) adjacent tracts of approximately 80 acres and 294 acres located in Fayette County, Texas. It shall be referred to as "Fayette County property" for purposes of this litigation.

2. The plaintiffs own the Fayette County property.

3. On January 10, 1979, plaintiffs entered into a written Agency Agreement with Robert Hilsher and William Hilsher.

4. On or about May 10, 1979, Robert and William Hilsher signed a written Sand and Gravel Lease with SRS, Walter Riddle, William Straughan and Floyd Skeen for the Fayette County property.

5. On or about May 31, 1979, SRS, Riddle, Straughan, and Skeen borrowed money from the Republic Bank of San Antonio to finance a mining operation on the Fayette County property. As part of the finance arrangements, they as-signed the Sand and Gravel lease to Republic Bank of San Antonio as security for the loan. On June 4, 1979, Robert and William Hilsher gave their written consent to this assignment.

6. On or about July 10, 1979, a second loan was obtained by SRS, Walter Riddle, William Straughan, and Floyd Skeen from North Side Bank. As part of this loan, Republic Bank of San Antonio was paid, and its rights were assigned to North Side Bank. SRS executed a promissory note payable to North Side Bank.

7. SRS, Walter Riddle, William Straughan, and Floyd Skeen also executed a Deed of Trust and Security Agreement to secure the second loan. These documents were submitted to Robert and William Hilsher for their approval. William Hilsher gave his written approval.

8. On or about October 1, 1979, Chambco took over the mining operations on the Fayette County property.

9. Defendant Robert L. Lehman, on behalf of Defendant North Side Bank, executed and delivered to the lessors releases of the above mentioned Deed of Trust and Security Agreement, which releases were dated October 10 and November 6, 1979.

10. On October 18, 1979, Chambco paid off SRS's note to North Side Bank and was assigned the promissory note and all the security rights of North Side Bank.

11. On November 26, 1979, SRS, Walter Riddle, William Straughan, and Floyd Skeen assigned the Sand and Gravel Lease to Chambco.

12. Chambco did not receive a copy of the written Agency Agreement between the plaintiffs and Robert Hilsher and William Hilsher until late September or early October, 1979.

13. From May 1979 through December 1979 plaintiffs accepted and cashed royalty checks first from SRS and then from Chambco.

14. In May of 1979, the plaintiffs paid George Berg, an attorney, to draft the Sand and Gravel Lease.

15. On February 28, 1980, plaintiffs and defendants entered into an agreed order which permitted Chambco to continue its mining operations on the property and allowed plaintiffs to cash any previously uncashed royalty checks.

16. On July 15, 1980, another agreed order was entered by which Chambco surrendered its right to mine the property effective July 31, 1980.

The parties also stipulated to facts concerning the master's findings, which are set forth later in this opinion.

Appellants challenge the trial court's judgment with fifty-two points of error, many of which complain of legally and factually insufficient evidence. In reviewing no evidence points, this court must consider only the evidence and inferences which support the challenged jury finding and must disregard all contrary evidence and inferences. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). In reviewing factual sufficiency points of error, the court must consider and weigh all of the evidence, both that in support of and that contrary to the finding, and set it aside only if it is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

■ In points of error one and two, appellants contest the jury's award of actual damages to Chambco. In response to Special Issue No. 20, the jury found that $632,-295.42 would reasonably compensate Chambco for the losses proximately caused by its reliance on appellants' representations. Appellants argue that the evidence of proximate cause is legally and factually insufficient. They further argue that any damages suffered by Chambco were not shown to be reasonable and necessary expenses, were incurred prior to any alleged wrong by appellants or were self-inflicted.

In its counterclaim, Chambco pled fraud and misrepresentation, and the jury found that certain of appellants' actions or representations were indeed fraudulent. Chambco is therefore entitled to recover in tort the actual amount of the loss resulting directly and proximately from the fraud. *Kneip v. Unitedbank-Victoria*, 774 S.W.2d 757, 759 (Tex.App.—Corpus Christi 1989, no writ). At trial Chambco presented uncontradicted testimony and exhibits that in reliance on appellants' representations, it invested the following amounts in developing appellants' property: (1) mobilization expenses of $123,994.60; (2) demobilization expenses of $38,042.98; (3) loss on equipment of $172,973.00; (4) loss on a 245 Excavator of $136,911.42; and (5) lease acquisition costs of $160,373.42.

Proximate cause consists of cause in fact and foreseeability. *Cook Consultants, Inc. v. Larson*, 700 S.W.2d 231, 236 (Tex. App.—Dallas 1985, writ ref'd n.r.e.). Dunbar Chambers testified that at the time he met with appellants to explain Chambco's involvement in the SRS operation, they were already unhappy with SRS and encouraged Chambco to stay involved. Chambco had already made a commitment to SRS to order some additional equipment and was eager to clarify what kind of relationship SRS and/or Chambco was going to have with the landowners.

A second meeting was held on October 9, 1979. Those present were Birdie Hilsher, John Pech (now her husband), their attorney Helen Schnell, Chambers, Chambco's president John Green and SRS's Straughan. Chambers, Green and Straughan assert that the owners agreed to a new lease with Chambco and that Mrs. Hilsher instructed Mrs. Schnell to draft it. Robert Hilsher testified that his mother called him later that day and told him Mrs. Schnell would be preparing a new lease for Chambco. Mrs. Pech denied that the parties came to any definite agreement; however, she did not know whether she told Chambers or Green that they would be given permission

in the future to excavate gravel from the property. Mrs. Schnell testified that a lease was promised but was conditioned on the removal of SRS from the property and the release of the deed of trust and security agreement. The owners did not tell Chambers and Green that they considered the SRS lease invalid without their signatures.

Green testified that the lease was not forthcoming, although Mrs. Schnell assured him by phone that it was being prepared. However, on October 19th, he received a letter from her detailing several concerns. He testified that when he called her, she told him not to worry as this was her way of handling the termination of the SRS lease. Green attempted to resolve the concerns in an effort to expedite the lease. In November Green received a copy of a letter to Straughan terminating the SRS lease. When he again called Mrs. Schnell, he was assured that there was no problem with Chambco's lease. In early December, Chambers received a letter asking what right Chambco had to be on the property. The next day, Green received a phone call directing him to make royalty payments to Birdie Hilsher and William Hilsher as the agency agreement was being terminated. Appellants' next communication was the lawsuit. Mrs. Schnell testified that the reason the owners did not execute a lease with Chambco was the company's continued affiliation with William Straughan. By then, the owners wanted nothing more to do with him.

Chambers testified that during the October 9th meeting, he discussed the investments Chambco had made and was preparing to make in the sand and gravel operation. Mrs. Schnell confirmed that Chambers and Green told appellants Chambco was going to put new equipment on the site. In particular, Chambers emphasized that before new equipment was ordered, Chambco needed assurance that it would be given a lease. He testified that he specifically asked, "Am I clear that we have an agreement to enter into a new lease so I can proceed to order this equipment?" On the basis of appellants' affirmative responses, Chambco placed the orders and did not cancel orders placed earlier to assist SRS. Thus, there is evidence that appellants' representations caused Chambco to invest money in the operation and, further, that the investment was foreseeable.

As noted above, Chambco's damages encompassed $160,373.42 in lease acquisition costs. Those costs included Chambco's payment of the $200,000 SRS/North Side Bank loan. With interest, that payment actually totalled $207,489.24; however, only one-half of the amount is included in the acquisition costs as the other half of the costs was allocated to a second SRS site. Appellants argue that the payment should not be included in the damage award. Chambco obligated itself on the note on July 10th, several months before it had any contact with appellants. Chambco's president John Green testified that it became apparent in early August that SRS could not re-pay the loan because it was not going to be paid by one of its major customers. Chambco then took steps to monitor the mining operation. Straughan confirmed that SRS became insolvent in July 1979 when it started to do business with a certain party. He also stated that the operation was never profitable. The promissory note came due on October 8, 1979, and the bank requested Chambco to pay the note as guarantor. The evidence thus shows that Chambco had to pay off the note, appellants' action notwithstanding, because SRS was unable to do so.

In its pleadings, Chambco asserted that the purpose of the loan was to finance SRS's mining operations on the lease at issue and on other leases. Chambco claims it relied on the existence of the lease and on appellants' continuing consent to SRS's mining operations on the property in making its decision to guarantee the loan. Nonetheless, we find that including the payment as a loss proximately caused by Chambco's reliance on appellants' representations is against the great weight and preponderance of the evidence. Appellants knew of or could have foreseen certain of Chambco's expenditures in reliance on the lease. However, the guarantee of the loan

and the subsequent necessity of honoring that guarantee because of business reverses suffered by SRS were not foreseeable. The award of actual damages to Chambco is thus reduced by the amount of $103,744.62 to $528,550.80.

Appellants also complain that Chambco did not prove the itemized expenses were reasonable and necessary. However, Special Issue No. 20 asked what sum of money would *reasonably* compensate Chambco for its losses, and appellants did not object on the grounds that there was no evidence that any sums were *reasonable and necessary*. Appellants thus failed to comply with the mandate of TEX.R.CIV.P. 274 to point out distinctly the matter to which one objects and the grounds of the objection. *Castleberry v. Branscum*, 721 S.W.2d 270, 276–77 (Tex.1986).

■ Finally, appellants argue that any damages to Chambco were self-inflicted because the company voluntarily left the property. Appellants contend there is no evidence that they did anything, other than filing and prosecuting this lawsuit, that prevented Chambco from using its equipment on their land. Chambco attempted to work the property under an agreed order until July of 1980, at which point the parties modified that order to allow Chambco to leave the property. It is clear from the testimony that the relationship between the parties deteriorated during the last months, and Chambco's voluntary removal from the fray does not affect its right to sue for damages.

Based on the evidence presented at trial, we find there was legally and factually sufficient evidence to support the jury's award of actual damages to Chambco except for the amount of the loan payment allocated to the Fayette County property. Points of error one and two are therefore overruled.

In points of error three and four, appellants argue that the evidence is legally and factually insufficient to support the jury's award of $850,000 exemplary damages to Chambco. Appellants maintain that there can be no recovery of exemplary damages without a recovery of actual damages. As we have affirmed the recovery of actual damages in this case, however, this argument does not apply. Points of error three and four are overruled.

Points of error five through eight concern the award of damages for breach of lease to Walter Riddle. In point of error eight, appellants advance a statute of limitations argument that is dispositive of the other points. This case originated with the agency agreement signed January 10, 1979, and the lease signed May 10, 1979. On November 26, 1979, SRS assigned the lease to Chambco. Appellants filed suit on February 11, 1980, and Riddle, Straughan and SRS filed a general denial on April 9, 1980. On June 1, 1984, Riddle, Straughan and SRS filed a counterclaim for breach of lease. Riddle was awarded $250,000 in damages and $60,000 attorney fees. Appellants contend that once the lease was assigned, Riddle had no justiciable interest in any cause of action arising within any period of time not barred by limitations. Any damages awarded to Riddle therefore constitute a double recovery of damages awarded to Chambco.

Riddle argues that appellants waived this defense by not submitting it as a special issue. However, whether the statute of limitations is applicable to a given factual situation is a question of law rather than a question of fact. *Smart v. Texas American Bank/Galleria*, 680 S.W.2d 896, 898 (Tex.App.—Houston [1st Dist.] 1984, no writ). Where the facts are undisputed, the defendant may establish that the plaintiff's claim is barred by the statute of limitations as a matter of law. *Intermedics, Inc. v. Grady*, 683 S.W.2d 842, 845 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). The dates relevant to this issue are not disputed, and appellants were not required to submit an issue on an undisputed fact.

■ In his brief, Riddle states that appellants assume the November 1979 assignment to Chambco bars Riddle from complaining about a breach subsequent to the assignment. Riddle argues that this statement cites no case law, no trial record or statement of facts and runs counter to jury findings on the assignment. It is not clear,

however, to which findings Riddle refers. We note that in the November 1979 assignment, SRS and Straughan, Riddle and Skeen conveyed the lease and certain royalty agreements to Chambco with no reservation of rights of any kind. It would appear, therefore, that SRS and its owners could be entitled to damages resulting from a breach of lease occurring prior to November 26, 1979, but not after that date. Riddle's counterclaim asserts that SRS and Chambco operated the leased premises from October 1, 1979. However, because of the assignment, SRS, Straughan, Riddle and Skeen were no longer entitled to any profits. At that point any damages were derivative of Chambco's and would constitute a double recovery.

■ Any compensable claims would therefore have to arise before November 26, 1979, and we find that such claims are barred by the statute of limitations. In support of his counterclaim, Riddle cites case law to the effect that if, at the time suit is filed, the defendant has a counterclaim that is not barred by the statute of limitations, the fact that the bar is completed before the counterclaim is urged in a proper pleading will not deprive him of the right to set off such counterclaim against the plaintiff at any time during the progress of the suit. *See Shaw v. Faires,* 165 S.W. 501, 504 (Tex.Civ.App.—Dallas 1914, no writ).

We note, however, that case law makes a distinction between a claim asserted as an independent cause of action and one asserted as a defense to an action. The ultimate purpose of a limitations law is to bar actions rather than to suppress or deny matters of defense. Accordingly, limitation statutes are not applicable to defenses as a general rule. 50 Tex.Jur.3d *Limitation of Actions* § 15 (1986).

The rule in this state is that where the subject matter of a defense interposed by the defendant constitutes an independent cause of action which does not go to the foundation of the plaintiff's demand, it cannot effect a reduction of the amount of the plaintiff's recovery except by way of setoff, and the statutes of limitation are available to the plaintiff in respect to such a defense. On the other hand, if the subject matter of the defense be of an intrinsically defensive nature, which, if given effect, will operate immediately as a negation of the plaintiff's asserted right to recover, or in abatement, either wholly or partially, of the amount claimed, the statute of limitation does not apply.

*Hennigan v. Heights Savings Ass'n,* 576 S.W.2d 126, 130 (Tex.Civ.App.—Houston [1st Dist.] 1978, writ ref'd n.r.e).

The question of whether an answer sets up a counterclaim or is merely defensive must be determined by the facts alleged, and not by the name given the plea or by the particular form of the prayer for relief. A test for making the determination is to inquire whether the defendant could have maintained a suit to enforce the claim before suit was brought by the plaintiff. If the defendant could have maintained such an independent suit, the claim will be regarded as a setoff or counterclaim. If the suit could not have been maintained, it is a defensive plea. 67 Tex.Jur.3d *Setoffs, Counterclaims, and Cross Actions* § 52 (1989). Under this test Riddle's claim for breach of lease was a counterclaim because appellants' alleged actions were grounds for an independent cause of action. As such, the claim was barred by the statute of limitations.

■ Riddle argues that his counterclaim was merely an amended pleading pursuant to Tex.Civ.Prac. & Rem.Code Ann. § 16.068 (Vernon 1986). However, Riddle's original answer was a general denial with no mention of a counterclaim. This was not sufficient to toll the statute until the counterclaim was filed over four years later. *See Swaim v. International Harvester Co.,* 505 S.W.2d 634, 636 (Tex.Civ.App.—Fort Worth 1974, writ ref'd n.r.e); *Trevino v. American Nat'l Ins. Co.,* 140 Tex. 500, 168 S.W.2d 656, 660 (Tex.Comm'n App.1943, opinion adopted).

Given the above analysis, we find that Riddle's counterclaim was barred by the statute of limitations as a matter of law. We therefore sustain point of error eight.

Points of error five through seven concern the legal and factual sufficiency of the evidence to support the award of damages. However, based on our determination that his claim was barred by limitations, he was not entitled to damages. We therefore modify the judgment to delete the $250,000 awarded him.

Appellants further argue that the trial court erred in awarding attorney fees to Riddle. In view of our holding on his counterclaim, we must also reverse this award. Attorney fees are recoverable only if the claimant finally obtains judgment. *Siegler v. Williams*, 658 S.W.2d 236, 240 (Tex.App. —Houston [1st Dist.] 1983, no writ). Point of error eight is sustained and the trial court's judgment is modified to delete the award of damages and attorney fees to Walter Riddle.

In point of error nine, appellants argue that the trial court erred in approving the master's report and incorporating it in the judgment because appellants timely filed specific objections to the report and timely requested that the trial court hear evidence before a jury on the matters submitted to the master. Appellants originally requested the appointment of a master to report on the amount and market value of sand, gravel and other material removed from their property because of the lengthy and technical testimony involved. All parties agreed to the appointment, and the trial court issued an order which contained the following language:

> It is further ORDERED that all parties to this suit shall agree to the referral of these issues to the Master. By signing and approving this Order, all parties agree to be bound by the findings and conclusions of the Master as if this portion of the case had been tried to the Court.

The master heard evidence over a period of nine days, and the transcript for that hearing alone ran over 2200 pages. After the master filed his report, appellants filed objections and amended objections and asked for a jury trial on the issues submitted to the master. The trial court held a hearing, approved the master's findings and conclusions, overruled the objections and denied the requested relief.

The trial court's order appointing the master is very clear. The order contained no provision for review of the master's findings, and the parties agreed to be bound by those findings "as if this portion of the case had been tried to the Court." The effect of such an agreement is discussed at length in *San Benito Cameron County Drainage Dist. v. Farmers' State Guar. Bank*, 192 S.W. 1145 (Tex.Civ.App. —San Antonio 1917, writ ref'd). After pointing out that without the enforcement of the agreement the appointment of a master would have been useless and futile, that court concluded that appellant, "having agreed in open court to the appointment, together with all the conditions appended thereto, is bound by such conditions as it would be in any other fair contract." *Id.* at 1147; *see also Myers v. Easterwood*, 60 Tex. 107 (1883). The court noted that the case was not complicated by the right to trial by jury as there had been no demand for one; however, the court questioned whether a jury trial could legally have been demanded after an agreement that the master's report should become final following a certain period of time. *San Benito*, 192 S.W. at 1146.

Appellants waived their right to a jury trial by requesting the appointment of a master, failing to provide for review of his findings and agreeing to be bound by those findings. The presentment of evidence to the master consumed a considerable amount of time and resources. It was only when the findings did not conform to appellants' expectations that they sought to retry the evidence. The trial court gave appellants a hearing on their objections and then accepted the master's report. We find no error in the trial court's action, and point of error nine is overruled.

Appellants next challenge the legal and factual sufficiency of the evidence to support the master's findings concerning the quantity of gravel removed from their property (points of error ten through thirteen) and its market value (points of error fourteen and fifteen). Specifically, appel-

lants complain that the business records upon which the finding of quantity was founded have no probative force, that the evidence shows a much larger amount was removed, and that the evidence does not support a finding of $3.12 per ton average market value.

The master's findings were as follows:

17. From October 1, 1979, to July 31, 1980, the master found that Chambco removed 69,152.34 tons.

18. Chambco paid royalties of $49,783.77 on this amount.

19. From May 10, 1979, through October 1, 1979, the master found SRS removed 40,605.67 tons.

20. SRS paid royalties of $13,264.75.

21. If a valid lease exists, Chambco and SRS have paid royalties for the materials removed.

22. The master found that the material removed by Chambco can be broken down as follows: (1) 867.23 tons were ⅜" gravel; (2) 27,535.79 tons were 1½" gravel; (3) 14,855.33 tons were bull rock; (4) 5,916.20 tons were 1" gravel; (5) 18,871.92 tons were road base; and (6) 270.85 tons were scrap.

23. The master found that the average market value of ⅜ gravel was $3.83 per ton.

24. The master found that the average market value of 1½" gravel was $3.76 per ton.

25. The master found that the average market value of bull rock was $1.13 per ton.

26. The master found that the average market value of 1" gravel was $4.60 per ton.

27. The master found that the average market value for road base was $3.28 per ton.

28. The master found that the average market value for scrap was $1.78 per ton.

29. The master found that the average market value of all materials removed from the Fayette County property was $3.12 per ton.

When a trial court files findings of fact, they are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing the evidence supporting a jury's answer. *Okon v. Levy*, 612 S.W.2d 938, 941 (Tex. Civ.App.—Dallas 1981, writ ref'd n.r.e). Those standards were set forth earlier in this opinion, and we will apply them to the master's findings.

Appellants first argue that the business records upon which the finding of quantity was founded have no probative force. Summaries of SRS and Chambco shipments of gravel from the property were admitted without objection, and the master obviously relied on them in making his findings. Chambco's president, John Green, testified that the summaries were prepared from the weight scale and delivery tickets generated when the loaded trucks were weighed. Green outlined Chambco's procedures and vouched for the accuracy of the records. He further testified that he compiled the SRS summaries from tickets delivered to the Chambco office when SRS closed but that he could not verify their accuracy. However, Floyd Skeen, who was responsible for the SRS operation, testified that he personally kept up with the tickets and made sure that every driver was weighed. He then gave two or three sets of tickets to Bill Straughan, who kept one for the office and sent another to Mrs. Hilsher.

Appellants maintain that the SRS tickets are incomplete and incorrect. They point out that the summaries do not cover May as there were no May tickets in the SRS box delivered to Chambco. However, Green testified that he was able to use the May royalty checks to determine that 276.72 tons of material were shipped from the property during that month. Green also attempted to resolve other inconsistencies in the records. The trier of fact is the sole judge of the credibility of a witness and the weight to be given his testimony. *Rego Co. v. Brannon*, 682 S.W.2d 677, 680 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e). The master found Green's testimony to be credible. After reviewing the testimony, we find no reason to dispute that assessment.

■ Appellants also assert that, accuracy aside, the SRS and Chambco summaries were controverted by the evidence. They argue that the testimony of their witnesses and experts confirms that the two companies actually removed a much larger amount of material from the property.

The evidence on this issue was lengthy and conflicting. We have reviewed all of the evidence and summarize it briefly. Witnesses for appellants testified about hills or rises that were no longer on the property, having been removed during the mining operation. Several neighbors and William Hilsher testified about seeing trucks leaving the property without being weighed. Appellants hired a number of experts who employed various scientific methods to measure the amount of material removed. One expert did so by surveying the excavations. Several experts in photogrammetry compared aerial photos taken in 1966 and 1984 to calculate the amount removed.

Appellees' experts contradicted this testimony by pointing out errors in the scientific methodology used by the opposing experts. They particularly criticized the quality of the photos and questioned the accuracy of the figures obtained. The eighteen-year difference in the photos made it difficult to pinpoint when material had actually been removed. Also, there was some dispute as to whether the property had ever been mined prior to the SRS/Chambco operation. That, as well as the fact that appellees were present on the property only a little over a year, made the figures additionally problematic. One of appellants' experts admitted that because the photos used in the calculations were taken in 1966 and 1984, he could not tell "the amount of material removed by any of the defendants or the material removed between May of 1979 and even up until 1984...." Once again, the master had the opportunity to observe the witnesses and assess their testimony. *Rego Co. v. Brannon*, 682 S.W.2d at 680. In an exchange with one of appellants' experts, he made it clear that he lacked confidence in some of that testimony. Based on our review of the record, we conclude that the findings of the master are fully sustained by the facts.

Appellants also contest the evidence supporting the master's finding that the average market value of all materials removed from the Fayette County property was $3.12. Appellants claim that certain invoices and documents show the material was sold for eight to ten dollars a ton. The difference in price appears to be attributable to freight charges. Appellants argue that in a trespass or conversion case, one is entitled to the enhanced value of the property when and where it is finally converted. Since most of the material at issue was sold in Harris County and therefore included freight costs, appellants argue that the average market value should reflect those higher prices.

■ The jury found that appellees were not guilty of trespass or conversion. The proper measure of damages in such cases is therefore not applicable. John Green prepared a summary showing the average price per ton, excluding freight charges, for every type of material that came from the Fayette County site during the time Chambco was operating the premises. In most cases where personal property valuations are involved, evidence of what an article or commodity actually sold for is some evidence of market value. *Gulf, Colo. & Santa Fe Ry. v. Hillis*, 320 S.W.2d 687, 691 (Tex.Civ.App.—Waco 1959, no writ). The master accepted these prices in calculating the average market value of all the materials. Thus, there was evidence to support his finding, and points of error fourteen and fifteen are overruled.

■ In points of error sixteen through forty-two, appellants challenge the legal and factual sufficiency of the evidence supporting the jury's findings on appellees' defensive issues. Those issues and findings are summarized as follows:

Special Issue No. 13—The jury found that appellants or their authorized agents consented to the assignment of the May 10, 1979, lease agreement to Chambco.

Special Issue No. 14—The jury found that appellants are estopped to challenge that assignment.

Special Issue No. 15—The jury found that appellants ratified the assignment.

Special Issue No. 16—The jury found that appellants waived their right to challenge the assignment.

Special Issue No. 18—The jury found that certain actions or representations were fraudulent.

Special Issue No. 23—The jury found that appellants' failure to inform appellees of their belief that the lease agreement was invalid even through they were aware of mining operations on their property was fraudulent.

Special Issue No. 28—The jury found that appellants breached the lease with SRS, Walter Riddle and William Straughan.

Special Issue No. 31—The jury found that appellants waived any breach of the lease agreement.

Special Issue No. 32—The jury found that appellants are estopped to claim any breach of the lease agreement.

To reiterate, our analysis of these points of error must once again be guided by the principle that the trier of fact, in this case the jury, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Rego Co. v. Brannon*, 682 S.W.2d at 680. We must also keep in mind the standard by which we are to review the evidence, particularly in response to a factual insufficiency challenge. In that instance, we review all of the evidence and set the finding aside only if it is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 244 S.W.2d at 661. This jury heard a great deal of conflicting testimony and answered all of the special issues in appellees' favor. We conclude that those answers are supported by the evidence.

Mrs. Flukinger, Mrs. Pech and Mrs. Krutilek testified that they knew of the lease and knew their agents had signed it; however, they thought they were supposed to sign it before it became valid. They also knew that SRS was on the property but thought it was for purposes of testing and also thought the royalties they were receiving were for the testing. They first saw the lease itself in September 1979. Yet they did not notify SRS at that time that they considered the lease invalid. Neither did William Hilsher, who was frequently on the property and was aware that a graveling operation was being conducted there.

Walter Riddle testified that he met with Mrs. Pech right about the time the lease was signed. She told him her sons were her agents and were to take care of the details of the sand and gravel lease. William Straughan testified that he never saw the agency agreement but was assured by the attorney whom the sisters paid to draft the agreement that the Hilsher brothers had the power to enter into the lease. He also testified that on the first Saturday following the signing of the lease, Birdie Pech and Bob Hilsher went over the property with Floyd Skeen and showed him the sections on which to mine. Mrs. Pech agreed that she showed the property but did so because she hoped to lease it to SRS. She also told her sons to accept the deal offered by SRS. At no time, however, did she tell the SRS principals that her sons were not authorized to sign a lease.

Mrs. Pech testified that once she and her sisters found out about the recorded deed of trust and security agreement, they hired Helen Schnell to get SRS off the property. How she accomplished that task was her business. Mrs. Pech testified, "We gave her the authority to do one thing, and that was to get everybody off the land. She played along with them and did what she had to do until she got her mortgage, then she said, 'Get off the land.'" Mrs. Pech also testified that at one point Mrs. Schnell told her, "They lied to me, so I lied to them." Mrs. Schnell's first letter to SRS complained of the recordation but assured SRS that the lessors had no intention of interfering with the sand and gravel operation. The letter did not mention the fact that the lessors considered the lease invalid.

Mrs. Schnell also wrote a letter to John Green suggesting a meeting to discuss the assignment of the SRS lease to Chambco and once again stated that the lessors did not want to interfere with any contract between SRS and Chambco nor with the SRS lease. Again there was no mention of an invalid lease. Mrs. Schnell testified at trial that these statements were a mistake. Mrs. Pech seemed to consider this letter part of Ms. Schnell's plan to get everyone off the property. She could not remember, however, whether Mrs. Schnell was acting on her instructions. Regarding the lease negotiations with Chambco, Mrs. Pech stated that the parties did not come to any definite agreement and that appellants did not promise Chambco a lease. Yet, this statement is contradicted by evidence discussed earlier in this opinion.

Appellants complain of "secret" assignments of the lease without their approval. However, the original assignment to Republic Bank of San Antonio was approved by their agents, who appeared to have authority to do so. An agent has apparent authority to act on behalf of a principal if the principal's conduct would lead a reasonably prudent person to suppose the agent had the authority he purported to exercise. *General Production Co. v. Black Coral Investments*, 715 S.W.2d 121, 123–24 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e). Mrs. Pech told Walter Riddle that the Hilsher brothers were her agents and were to take care of the details of the lease. Furthermore, appellants did not tell either SRS or Chambco that they considered the lease invalid without their signatures, thus allowing those companies to assume the agents' signatures were sufficient. The assignment to North Side Bank was initially approved by William Hilsher, and the assignment to Chambco was made on the basis of appellants' representations to Chambco.

In sum, the jury heard testimony showing that appellants apparently acquiesced to their agents' handling of the lease. They had numerous opportunities to assert the invalidity of the lease but did not do so. They accepted royalty payments ostensibly for testing; however, they made no con-

certed effort to find out what was going although they later testified they saw large amounts of material being removed from the property. They encouraged Chambco to invest in the operation with the prospect of a lease and assured both Chambco and SRS that they did not intend to interfere with the lease; yet their professed plan was to get everyone off the property. Thus there is evidence to support the jury's findings, and those findings are not so against the great weight and preponderance of the evidence as to be manifestly unjust. Points of error sixteen through forty-two are overruled.

■ In points of error forty-three through fifty, appellants complain of the factual and legal sufficiency of the evidence to support the jury's findings on several of appellants' issues. Those issues and findings are summarized as follows:

Special Issue No. 2—The jury found that appellees did not commit a trespass against appellants on appellants' land.

Special Issue No. 4—The jury found that appellees did not convert sand, gravel or other material from appellants' land.

Special Issue No. 6—The jury found that neither Chambco, Dunbar Chambers, John Green, North Side Bank nor Robert Lehman assumed the obligations of SRS, Straughan, Riddle and Skeen towards appellants.

Special Issue No. 7—The jury found that none of the events of default set out in the sand and gravel lease occurred between May 10, 1979, and July 31, 1980.

Much of the evidence previously discussed applies to these points of error as well. Regarding trespass and conversion, SRS was on the land and conducting a sand and gravel operation under what the company thought was a valid lease. As for Chambco, appellants initially approved its presence on the property and encouraged Chambco to build up the operation. Appellants' efforts to show that more material was removed than was accounted were not conclusive and were effectively contradicted by appellees.

Appellants refer us to John Green's letter of October 29th to Helen Schnell in which he stated that Chambco was not and would not be removing sand and gravel from the leased property. They maintain this letter concealed material facts because Chambco had already taken over the mining operation as of October 1st. Green testified he meant that Chambco controlled the operation but did not handle all aspects of it. SRS was still on the property with Chambco's financial help and using equipment leased from Chambco. The assignment of the lease to Chambco did not occur until late November. Appellants failed to carry their burden of proof on the challenged issues, and points of error forty-three through fifty are overruled.

 Finally, in points of error fifty-one and fifty-two, appellants contend that the trial court erred in awarding attorney fees to North Side Bank and Robert Lehman. This award was based on the jury's findings in response to Special Issues Nos. 26 and 27 that appellants' Deceptive Trade Practices Act claim against the bank and Lehman was brought in bad faith and for the purpose of harassment. Appellants contend the evidence is legally and factually insufficient to support those findings.

Appellants filed their DTPA claim on June 4, 1984, in their first amended petition. North Side Bank and Robert Lehman then filed a counterclaim for attorney fees and court costs pursuant to TEX.BUS. & COM. CODE ANN. § 17.50(c) (Vernon 1987), alleging that the claim was groundless and brought in bad faith or for the purpose of harassment. Appellants withdrew the DTPA claim in their fourth amended petition filed March 21, 1985. The fact that appellants did not prosecute the claim to a conclusion does not affect appellees' right to recover attorney fees. *Intertex, Inc. v. Cowden*, 728 S.W.2d 813, 820 (Tex.App.—Houston [1st Dist.] 1986, no writ).

Appellants contend they had reason to believe that SRS had taken more gravel than it had accounted for to appellants. They claim that under *Harwath v. Colwell*, after the 1977 amendments to the DTPA, this act would be a DTPA violation. 648

S.W.2d 709 (Tex.App.—Dallas 1982, no writ). According to this argument, appellants were consumers of the services of the SRS group. With the assistance of the bank and Lehman, the SRS group represented that the lease agreement conferred certain rights and obligations which it did not confer. The bank's alleged assistance was the $200,000 loan.

Without going into an extended discussion of whether the DTPA even applies to this case, we note that there was absolutely no evidence that the bank and Robert Lehman were involved with SRS at any point prior to the loan. This means that there could have been no conspiracy at the time SRS leased the property and made the alleged representations. Appellants' DTPA claim did not refer to the bank or Lehman by name nor did it specify what DTPA violations those two parties were alleged to have committed. Appellants were not able to show that Lehman and the bank did anything more than loan SRS $200,000. In deposition testimony, Victor Krutilek agreed that he was unable to explain what caused appellants to believe that either the bank or Lehman had knowledge of any improper motive or intent of any defendant to take gravel off the property without paying for it. This is sufficient evidence of, at the least, bad faith, and points of error fifty-one and fifty-two are overruled.

Appellees Chambco, Chambers and Green request in a cross-point that we award them costs for a frivolous appeal pursuant to TEX.R.APP.P. 84. Having sustained several of appellants' points of error, we obviously do not find all of appellants' arguments to be without merit, and we decline to award such costs. The cross-point is therefore overruled.

The judgment of the trial court is affirmed as modified.