**Opinion issued May 11, 2017**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00424-CV

———————————

**SYRIAN AMERICAN OIL CORPORATION, S.A., Appellant**

**V.**

**PECTEN ORIENT COMPANY F/K/A PECTEN ASH SHAM F/K/A PECTEN SYRIA PETROLEUM COMPANY, Appellee**

*and*

**PECTEN ORIENT COMPANY F/K/A PECTEN ASH SHAM F/K/A PECTEN SYRIA PETROLEUM COMPANY, Cross-Appellant**

**V.**

**SYRIAN AMERICAN OIL CORPORATION, S.A., Cross-Appellee**

Appeal from the 190th District Court
Harris County, Texas
Trial Court Case No. 2007-67830

**O P I N I O N**

This case arises out of a settlement agreement reached between a royalty interest owner and an operator of Syrian oil and gas properties. In that settlement agreement, the parties released each other from any and all claims against one another, known or unknown, as of the time it was made.

Seventeen years later, the royalty owner brought this suit against the operator for fraud, claiming that the operator had fraudulently induced the owner into the settlement. The operator counterclaimed against the owner for breach of the settlement agreement, seeking its attorney's fees as damages for that breach.

A jury found that the owner should have discovered any fraud in 1989, as of the date that the parties reached their settlement. As to the operator's counterclaim for breach of the settlement agreement, the jury found that the owner had breached the settlement agreement by bringing this suit. But the jury also found that the operator had fraudulently induced the owner into entering the settlement agreement, and declined to award damages to the operator. The trial court entered a take-nothing judgment against both parties' claims.

In its appeal, Syrian-American Oil Corporation, N.A., the royalty owner, challenges the evidentiary support for the jury's limitations finding against its claim for fraudulent inducement. SAMOCO contends that conclusive evidence establishes that it did not discover any fraudulent inducement until 2006. It further contends that it is entitled to judgment on its fraudulent inducement claim because sufficient

2

evidence exists to support the jury's finding of fraud. Finally, SAMOCO contends that the trial court erred in granting partial summary judgment on part of an additional claim for breach of contract based on post-settlement events.

In a cross-appeal, Pecten Orient Company, the operator, contends that the evidence supports the jury's finding that SAMOCO breached the settlement agreement, but that no evidence supports the jury's finding that Pecten fraudulently induced SAMOCO into entering that agreement. Pecten further contends that it proffered uncontroverted evidence of the attorney's fees that it has expended in defending this case and thus the jury's verdict of $0 in damages for SAMOCO's breach of the settlement agreement is against the weight of the evidence.

In response to Pecten's appeal, SAMOCO replies that Pecten's counterclaim for breach of the settlement agreement is time-barred and the evidence supports the jury's award of $0 in damages on Pecten's counterclaim.

We conclude that the trial court properly rendered judgment against SAMOCO's claims as time-barred by the applicable statute of limitations. We further conclude that the trial court properly granted the partial summary judgment that is challenged on appeal. Finally, we conclude that Pecten's counterclaim for breach of the settlement agreement was not time-barred and is not excused by the jury's fraud finding, because the fraud the jury found was related to a pre-suit

misrepresentation and not made in contemplation of the settlement of a claim identified in a yet-to-be-filed lawsuit.

Having found that SAMOCO breached the settlement agreement, the jury's award of $0 in damages for attorney's fees incurred in enforcing the agreement is not supported by the attorney's fee evidence, which was uncontroverted at trial. We therefore affirm the judgment that SAMOCO take nothing and reverse and remand Pecten's claim for attorney's fees for breach of the settlement agreement for a new trial.

## BACKGROUND

The parties have a decades-long history relating to oil and gas concessions granted by the Syrian government for development of oil and gas fields located in Syria.

### A. Syria grants a service contract for exploration and production.

In 1977, SAMOCO's predecessor-in-interest, the Syrian American Oil Corporation, executed a service contract with the Syrian government. A service contract is an agreement between an oil company and a foreign government in which the foreign government confers the exclusive right to explore and produce oil reserves in a specified geographic area. For a share of the production from these government-owned reserves, the oil company agrees to bear the costs of exploration,

4

development, and production. The 1977 service contract provided for a total exploration period of eight years, and it expired in October 1985.

The contract specified that, if development led to a commercially producing oil and gas well, a notice of a "Commercial Discovery" would convert the exploration area capable of production into a "Development Lease Area." Once a DLA was established, the contractor had the exclusive right to produce oil and gas from it for 25 years after production began, with the possibility of an additional 10-year extension.

The service contract also required the developer to select and relinquish acreage within the area that had not become part of a DLA during the exploration period: 25% of the acreage after four years of exploration and an additional 25% after six years. These partial relinquishments were scheduled for 1981 and 1983. In October 1985, at the end of the service contract's eight-year term, SAMOCO was required to relinquish any remaining portion of the original exploration area that had not been converted to a DLA.

**B. SAMOCO assigns its rights to Pecten but retains an interest.**

Shortly after executing the service contract, SAMOCO assigned 60% of its interest in the contract to the Coastal Oil and Gas Corporation. In August 1982, SAMOCO and Coastal assigned their interests in the service contract to Pecten and its affiliate, Syria Shell Petroleum Development B.V. The assignment agreement

provided in section 6 that SAMOCO and Coastal would retain a combined 6% share—known as an overriding royalty interest—of Pecten and Shell Syria's combined 62% share of the value of the production: SAMOCO retained 4% and Coastal retained 2%. The assignment agreement granted SAMOCO and Coastal the right to monitor these section 6 payments.

In 1983, Pecten and Shell Syria relinquished 25% of the exploration area not yet converted to a DLA, as required under the service contract.

## C. Pecten makes agreements with the Syrian government to continue exploration beyond the initial concession period without notifying SAMOCO.

In the summer of 1984, the parties drilled a well on the DLA known as the Deir Ez Zor block. The successful well, known as the Thayyem well, resulted in a series of "annexes" to the original service contract with the Syrian government. The first annex, executed in 1984, extended Pecten's exploration rights for a year beyond the service contract's 1985 original expiration date. After a nonsubstantive second annex, Pecten procured a third annex, which extended the exploration period for an additional year. These annexes did not change the fiscal terms of the original service contract.

In October 1987, Pecten, Shell Syria, and the Syrian government entered into a fourth annex. The fourth annex occurred after the government had obtained a competitive bid from an unrelated third party to re-lease the fields. Like the previous

three annexes, the fourth annex extended the exploration period. The fourth annex also adopted financial terms different from the original service contract for both the payment of royalties to the Syrian government and the production sharing between the parties to the service contract. The fourth annex also granted conditional exploration rights to a new area in Deir Ez Zor through October 25, 1988.

Pecten inserted language in two places in the fourth annex indicating that it was independent from the original service contract:

> The obligations and rights subject of this Annex shall be considered independent from the Original Service Contract.
>
> * * *
>
> It is understood that the petroleum produced and saved from the New Area and all the documents and records related to the execution of Petroleum Operations under this Annex shall be treated independently and separately from those under the Original Service Contract.

Pecten did not disclose to SAMOCO that it had entered into these annex agreements with the Syrian government at the time they were executed.

The fourth annex became a major source of conflict between SAMOCO and Pecten.

During 1986 and 1987, Pecten attempted to buy SAMOCO's royalty interest, but SAMOCO refused to sell. In May 1988, Pecten sent its corporate representative, Gary Cameron, to meet with SAMOCO's representative, Houssam Bahri, to make another buyout proposal. During this meeting, SAMOCO learned that Pecten had participated in the annexes to the original service contract. SAMOCO learned that

7

Pecten's position was that SAMOCO's royalty interest applied to discoveries made before October 1985—under the original service contract—and did not apply to discoveries after that date was extended by the annexes.

### D. SAMOCO sues Pecten for failing to pay royalties based on the annex agreements, culminating in a settlement.

SAMOCO and Coastal sued Pecten and Shell Syria in Harris County on July 12, 1988 for a declaratory judgment and breach contract. In the lawsuit, SAMOCO alleged that the annexes with the Syrian government entitled SAMOCO to royalty payments under the original service contract. SAMOCO and Coastal alleged that Shell Syria and Pecten had: (1) failed to disclose to SAMOCO that they had obtained annexes to the service contract that extended the exploration period; (2) withheld royalty payments due to SAMOCO and Coastal under the 1982 assignment and the first, third, and fourth annex agreements, and (3) failed to provide the reports and information required by the 1982 assignment agreement. SAMOCO's original petition stated SAMOCO's understanding that Pecten took the position that Pecten did not owe royalties to SAMOCO under the annexes, and further stated that SAMOCO disagreed with Pecten's position:

> [Pecten and Shell Syria], for the first time, made the claim that [SAMOCO and Coastal] were only entitled to Section 6 revenue on Production Sharing Crude Oil attributable to those fields discovered prior to October 25, 1985, the original termination date of the exploration period specified in the SERVICE CONTRACT.

8

SAMOCO identified that Pecten had extended the service contract by annex or amendment and had "until recently, kept secret the existence of that Annex or Amendment and have, through the date of filing this petition, refused and failed to disclose the contents thereof to [SAMOCO and Coastal]." SAMOCO alleged that "the SERVICE CONTRACT has been amended to extend the Exploration Period for a number of years and allege that the termination date thereof is well in the future."

SAMOCO served Pecten with discovery requests. After Pecten had interposed objections to those discovery requests, but before it had produced any documents, the parties discussed settlement. In furtherance of those discussions, Pecten produced copies of the first, third, and fourth annexes to SAMOCO and Coastal.

The parties reached an accord and executed a settlement agreement on September 15, 1989. The settlement agreement acknowledged that the parties' dispute centered on whether the SAMOCO was entitled to payments based the annexes to the agreement with the Syrian government, including the fourth annex:

> WHEREAS, subsequent to entry of the Assignment Agreement by the parties thereto, the following agreements regarding or referencing the Service Contract were entered into among [the Syrian Government, the Syrian Petroleum Company], Pecten, Shell, and Deminex Deutsche Erdoversogungsgesellschit aft mbH or its affiliates:

9

(a) Annex signed on December 4, 1984, and ratified by [the Syrian Government] Law No. 1 on January 10, 1985 ("First Annex");

(b) Second Annex signed on May 30, 1985, and ratified by [the Syrian Government] Law No. 12 on August 12, 1985 ("Second Annex");

(c) Third Annex signed on August 4, 1986, and ratified by [the Syrian Government] Law No. 33 on November 5, 1986 ("Third Annex");

(d) Fourth Annex signed on October 24, 1987, and ratified by [Syrian Government] Law No. 28 on October 28, 1987 ("Fourth Annex");

WHEREAS, the First, Third, and Fourth Annexes provided for further exploration periods by Pecten/Shell/Deminex within portions of the geographical area within the Syrian Arab Republic originally delineated in . . . the Service Contract (the "Deir Ex Zor Area") following the original exploration period expiration date of October 25, 1985 . . . .

The agreement restated the parties' disagreement whether SAMOCO's interest in new exploratory wells terminated in 1988 and whether the annexes were part of a single agreement under the service contract or were independent agreements:

Pecten has advised Coastal/SAMOCO that the right of Pecten/Shell/Deminex to commence new exploratory wells pursuant to the Fourth Annex terminated on October 25, 1988, pursuant to the Third Annex terminated on October 25, 1987, pursuant to the First Annex terminated on October 25, 1986, and pursuant to the original Service Contract terminated on October 25, 1985 . . . .

The settlement agreement declared that the these termination dates were not intended "by any party as any concession as to whether the Service Contract, First

Annex, Third Annex, and Fourth Annex constitute a single agreement or multiple independent agreements."

Under the settlement agreement's terms, Pecten and Shell Syria agreed to pay SAMOCO and Coastal more than $2 million. The parties further agreed that SAMOCO and Coastal would retain a 6% overriding royalty interest in the Deir Ez Zor fields developed during the original service contract term, the first annex, and the third annex, but not the fourth annex. The settlement agreement expressly provided that SAMOCO would have no overriding royalty interest in production under the fourth annex or any other future production unless it was part of existing DLAs established by the service contract and the first and third annexes, or allocated to a reservoir that is common to, overlaps with, intrudes from, or protrudes into one of those areas:

> Except as may be applicable pursuant to [the common reservoir allocation provision] Coastal/SAMOCO shall not be entitled to any Section Six Payments pursuant to the Assignment Agreement or this Settlement Agreement with respect to (a) Fourth Annex Production Sharing Crude Oil or (b) any Crude Oil produced by Pecten/Shell from areas other than Development Lease Areas now or hereafter established pursuant to Article III(d) of the Service Contract with respect to the Service Contract Fields, First Annex Fields or the Third Annex Fields.

In exchange for the cash settlement and the continuation of payments under the DLAs established by the service contract, the first and third annexes, and reservoirs determined to be common to those areas, SAMOCO waived any and all

11

claims for "any other payments made or due prior to the effective date of [the] Settlement Agreement." SAMOCO also agreed to release Pecten from "any and all claims . . . known or unknown, asserted or not asserted, as of the date of execution of this Settlement Agreement, that arise in connection with, or with respect to, Sections 6 and/or 12 of the Assignment Agreement."

The settlement agreement contained a merger clause: "This Settlement Agreement constitutes the entire understanding between the parties relating to the subject-matter hereof and supersedes all other negotiations and agreements, whether written or oral, among the parties concerning such subject-matter."

From 1989 until 2006, Pecten and Shell Syria paid SAMOCO's monthly overriding royalty payments pursuant to the settlement agreement.

Meanwhile, in 2003, a seventh annex to the service contract was executed by the Syrian government, the Syrian Petroleum Company, Shell Syria, Petro-Canada Deir Ez Zor GmbH, and Petro-Canada Ash Sham GmbH. Known as the "deep and lateral agreement," this annex permitted the contracting parties to "explore deep hydrocarbons" that had not been previously developed in DLA areas under the service contract, the fourth annex, and another contract, known as the Ash Sham contract.

In June 2006, Pecten offered to buy out SAMOCO's royalty interest for $4.1 million. A Shell Syria representative approached SAMOCO representative

Houssam Bahri with the offer. To assist in evaluating the offer, Bahri hired Michael Foley, a former Pecten employee who had worked in Pecten's contracts department in Syria. Upon reviewing the terms of the 1989 settlement agreement, Foley expressed surprise that it had conferred no overriding royalty interest relating to the fourth annex. Foley viewed the fourth annex as an extension of the original service contract, and in his opinion, Pecten had also viewed it that way, despite its insertion of language in the fourth annex that the fourth annex was an agreement independent from the original service contract. In Foley's view, SAMOCO was entitled to an overriding royalty interest in any production under the fourth annex.

### E. SAMOCO sues Pecten for fraudulently inducing the settlement agreement.

Based on the conversations that it had with Foley, SAMOCO sued Pecten and Shell Syria on November 7, 2007. SAMOCO alleged claims for breach of contract, fraud, and breach of implied covenant of good faith and fair dealing causes of action. Pertinent to this appeal, SAMOCO's suit alleged that:

- Pecten had fraudulently induced SAMOCO to enter into the 1989 Settlement Agreement because it had misrepresented SAMOCO's right to royalties under the fourth annex; and

- SAMOCO was entitled to royalties on deep and lateral production under the 1989 settlement agreement and the 2003 Deep and Lateral Annex.

13

More than four years into the litigation, Pecten counterclaimed for breach of contract against SAMOCO, contending that SAMOCO's claims against it breached the 1989 settlement agreement.

Pecten moved for summary judgment. The trial court granted partial summary judgment with respect to SAMOCO's deep and lateral claims. The case then proceeded to trial on SAMOCO's fraudulent inducement claim and Pecten's breach of contract counterclaim.

On the fraud claim, the trial court asked the jury: "Did Pecten fraudulently induce SAMOCO Panama to enter into the 1989 Settlement Agreement?" The trial court instructed the jury as to the standard pattern jury charge elements of fraud and then asked the jury to answer "Yes" or "No" for three subparts. The jury answered "Yes" only as to subpart (b):

> b. Pecten's inclusion of language in the Fourth Annex stating that: (i) "The obligations and rights subject of this Annex shall be considered independent from the Original Service Contract;" and (ii) "It is understood that the petroleum produced and saved from the New Area and all the documents and records related to the execution of Petroleum Operations under this Annex shall be treated independently and separately from those under the Original Service Contract."

> ANSWER: <u>Yes.</u>

Thus, the jury found that Pecten had fraudulently induced SAMOCO into entering into the September 1989 settlement agreement by including language in the

14

October 1987 fourth annex to reflect that the annex was an independent agreement with the Syrian government rather than an extension of the original service contract. It found that $179,362.18 in actual damages were proximately caused by the fraud, and it awarded punitive damages.

The jury also found, however, that SAMOCO, in the exercise of reasonable diligence, should have discovered by September 15, 1989—the same day that the Settlement Agreement was executed—that Pecten's inclusion of language in the Fourth Annex had induced the fraud. It further found that SAMOCO had "unreasonably delay[ed] in asserting its claim based on inclusion of language in the Fourth Annex" and that Pecten had "made a good faith change of its position to its detriment in reliance upon the delay."

With respect to Pecten's breach of contract claim, the jury found that SAMOCO had failed to comply with the 1982 settlement agreement, but it awarded Pecten $0 damages for "[t]he attorney's fees, expenses and costs incurred by Pecten in defending against claims by SAMOCO Panama that are subject to release in the 1989 Settlement Agreement."

Both parties moved to disregard those jury findings against their respective claims and for judgment on the findings supporting their claims. The trial court rendered judgment on the verdict, ordering that each party take nothing and bear its own costs.

15

**SAMOCO'S APPEAL**

## I.     Limitations

The jury found that SAMOCO discovered, or should have discovered, its claim for fraudulent inducement in 1989.  SAMOCO contends that the evidence does not support this finding, because the evidence conclusively establishes that SAMOCO had no reason to discover the fraud before June 2006, when Foley first shared his opinion that SAMOCO was entitled to receive royalty payments under the fourth annex.  It further relies on the jury's fraudulent inducement finding to contend that the jury's discovery rule finding must be disregarded.

### A. The evidence supports the jury's finding that Pecten's fraudulent inducement should have been discovered in 1989.

Longstanding precedent upholds application of the discovery rule to determine whether a fraud cause of action is time-barred.  *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 57 (Tex. 2015) (quoting *Ruebeck v. Hunt*, 176 S.W.2d 738, 739 (Tex. 1943)); *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 928 (Tex. 2011).  We turn to the rule's application in this case.

The jury determined that SAMOCO, in the exercise of reasonable diligence, should have discovered the fraud relating to the fourth annex by the date that it executed the settlement agreement.  This finding is supported by the recitals in the settlement agreement that expressly acknowledge the parties' disagreement about whether the fourth annex constituted an independent agreement.  SAMOCO did not

make further inquiry beyond obtaining a copy of the fourth annex. In its allegations in the 1988 lawsuit against Pecten, SAMOCO stated that Pecten had wrongly taken the position that annexes to the service contract were independent agreements, and had not alerted SAMOCO to any of the annexes or paid any royalties under them. Although SAMOCO contends that the recitals in the fourth annex misrepresented that the fourth annex was an independent agreement, SAMOCO was on notice of the annex's existence and of its potential claim to unpaid royalties under it by 1989. In the 1988 lawsuit, SAMOCO alleged that Pecten had concealed that it owed payments under the fourth annex. The settlement agreement recognizes the dispute between the parties on this issue, disclaiming that either party had made "any concession as to whether the Service Contract, First Annex, Third Annex, and Fourth Annex constitute a single agreement or multiple independent agreements." This evidence supports the jury's finding that SAMOCO did not exercise reasonable diligence in discovering its claim that the fourth annex contained an actionable misrepresentation. We hold that sufficient evidence supports the jury's finding that SAMOCO should have discovered fraud in connection with the execution of the fourth annex by May 1989. *See Hooks*, 457 S.W.3d at 61 (holding that factfinder could consider inconsistencies in available information when determining whether reasonable diligence would have uncovered fraud); *Ross*, 356 S.W.3d at 929–30

17

(applying reasonable diligence standard to determine whether discovery rule extended statute of limitations for fraud claim).

## B. The discovery rule finding does not conflict with the fraud finding.

In finding that Pecten committed fraud, the jury found that SAMOCO had justifiably relied on the fourth annex language that it was an independent agreement in deciding to relinquish any claim that it had to payments related to the fourth annex. SAMOCO complains that the jury's discovery rule finding conflicts with this fraud finding. SAMOCO observes that, when a tortfeasor knows that a representation is false and made with the intent to defraud, liability is not excused because the defrauded party who relied on the representation failed to discover the fraud. *See Isenhower v. Bell*, 365 S.W.2d 354, 357 (Tex. 1963) ("When one has been induced to enter into a contract by fraudulent representations, the person committing the fraud cannot defeat a claim for damages based upon a plea that the party defrauded might have discovered the truth by the exercise of proper care."), *quoted in Koral Indus. v. Sec.-Conn. Life Ins. Co.*, 802 S.W.2d 650, 651 (Tex. 1990) (per curiam). The cases upon which SAMOCO relies, however, do not address the reasonable diligence standard, which a plaintiff must satisfy in order to delay the accrual of the applicable statute of limitations.

The reasonable diligence standard applied in the limitations context is not the same as the justifiable reliance standard incorporated as an element of actionable

18

fraud. The Texas Supreme Court has recognized that reliance on a misrepresentation may be justified if the party actually relies on the misrepresentation, even without diligent inquiry into its veracity. *See Koral*, 802 S.W.2d at 651; *Trenholm v. Ratcliff*, 646 S.W.2d 927, 933 (Tex. 1983); *see also* RESTATEMENT (SECOND) OF TORTS § 545A cmt. b (1977) ("Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of application of a community standard to all cases."); RESTATEMENT (SECOND) OF CONTRACTS § 172 (1981) ("A recipient's fault in not knowing or discovering the facts before making the contract does not make his reliance unjustified unless it amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.").

Different policies, however, animate the discovery rule. As a carefully drawn exception, the discovery rule balances the conflicting policy benefits of precluding stale or spurious claims against the risks of precluding meritorious claims that fall outside an arbitrarily set period. *See S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex. 1996) (quoting *Robinson v. Weaver*, 550 S.W.2d 18, 20 (Tex. 1977)). The discovery rule exception to statutes of limitations is purposefully narrow. *See Ross*, 356 S.W.3d at 929; *see also Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313 (Tex. 2006) (explaining that the court has "restricted the discovery rule to exceptional cases to avoid defeating the purposes behind the limitations statutes") (first citing *S.V.*, 933 S.W.2d

at 25; and then citing *Computer Assocs. Int'l, Inc. v. Altai*, 918 S.W.2d 453, 456, 457 (Tex. 1996)). It requires that a party exercise reasonable diligence in discovering facts relating to its claims. *Via Net*, 211 S.W.3d at 314.

For a delayed accrual, SAMOCO is held to the objective duty of reasonable diligence, and is entitled to tolling of the statute of limitations only until it knew or should have known by exercising reasonable diligence of the facts giving rise to its cause of action. *See Barker v. Eckman*, 213 S.W.3d 306, 311–12 (Tex. 2006); *Marshall*, 342 S.W.3d at 67. The jury had before it sufficient evidence to conclude that SAMOCO, by exercising reasonable diligence, could have discovered any fraud relating the representations in the fourth annex by the time it executed the settlement agreement.

Accordingly, we hold that legally and factually sufficient evidence supports the jury's discovery rule finding and that the finding properly was applied to bar SAMOCO's fraudulent inducement claim. We therefore do not reach SAMOCO's challenges to the jury's finding supporting laches or the disregard of jury's damages findings.

## II. Summary Judgment on the Deep and Lateral Claim

SAMOCO next contends that the trial court erred in granting Pecten partial summary judgment on SAMOCO's claim for section 6 payments associated with the deep and lateral annex. SAMOCO asserts that the terms of the 1982 assignment

20

agreement and the settlement agreement entitle it to section 6 payments because the deep and lateral annex covered reserves under the settlement agreement. Pecten moved for summary judgment on this claim, contending that the evidence conclusively established that the deep and lateral annex did not confer any payment obligation to SAMOCO under either the 1982 assignment agreement or the settlement agreement.

The 1982 assignment agreement obligated Pecten and Shell to (1) pay SAMOCO $8 million, and (2) give SAMOCO an overriding royalty interest in "Production Sharing Crude Oil" under the service contract. The 1989 settlement agreement modified the parties' agreement. It provided that the Syrian Syrian government's interpretation of the allocation of Production Sharing Crude Oil "shall be determinative for the purposes of calculating the quantity of Section Six Production Sharing Crude Oil" under the service contract.

Pecten provided both agreements as summary judgment evidence. Pecten also provided the deposition testimony of its corporate representative, Gary Cameron, in support of the summary judgment motion. Cameron testified that, following the expiration of the fourth annex in 1988, the Syrian government determined that the parties' production rights to potential deep and lateral production had expired because the parties had not provided proper notice of their intent to develop the deep and lateral horizons in the development areas.

Cameron's testimony that any deep and lateral production right terminated is uncontroverted. SAMOCO points to the provision of the settlement agreement entitling it to royalties on all oil "which is produced by Pecten/Shell from anywhere within the Development Lease Areas . . . (regardless of whether produced from reservoirs located at, above or below depths of current or future wells within the Development Lease Areas)." But this language must be read together with the 1982 assignment agreement, which provided for termination, and the settlement agreement, which provided that the Syrian government determined the allocation area. When the Syrian government terminated any production right Pecten may have had in the deep and lateral reservoirs under the service contract, any derivative right SAMOCO had to royalties on production from those reservoirs was likewise terminated. This reading is consistent with Cameron's undisputed testimony. Under the parties' settlement agreement, the Syrian government's interpretation was determinative.

SAMOCO's response relies on an affidavit from Foley in which he declared that, based on his experience, the deep and lateral annex "is simply an extension or amendment to the Service Contract." SAMOCO also proffered the affidavit of Richard Harper, Jr., who testified to industry custom and reached the same conclusion as Foley. The trial court sustained Pecten's objection to Harper's

22

affidavit as rendering inadmissible legal conclusions.[1] But even if it were admitted, Harper's affidavit, which contains statements regarding how operators generally treat annexes as a matter of industry custom, does not address the impact of the 1989 settlement agreement on any right to production payments under the 1982 assignment agreement. The undisputed evidence demonstrates that, by governmental decree, the development area specified in the service contract does not include the reservoirs made the subject of the deep and lateral annex. Accordingly, we hold that the trial court did not err in granting summary judgment on SAMOCO's claim for deep and lateral production payments.

Having rejected SAMOCO's challenges to the trial court's judgment against its claims, we turn to Pecten's cross-appeal, which challenges the trial court's judgment against Pecten's claim for breach of the parties' settlement agreement.

## PECTEN'S CROSS-APPEAL

In its cross-appeal, Pecten contends that the jury's zero damages finding on its counterclaim for breach of the 1989 settlement agreement is against the great weight and preponderance of the evidence. SAMOCO responds that Pecten's

---

[1] SAMOCO takes exception to the trial court's evidentiary ruling, but it does not explain how the ruling constitutes an abuse of discretion. *See City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995) ("The admission and exclusion of evidence is committed to the trial court's sound discretion.") (citing *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989)).

counterclaim for breach of contract is time-barred because Pecten did not amend its pleadings to add its breach-of-contract counterclaim until more than four years after SAMOCO filed its original petition. SAMOCO further responds that sufficient evidence supports the jury's $0 finding as damages for breach of the settlement agreement. Finally, SAMOCO contends that the jury's finding that Pecten fraudulently induced the settlement agreement vitiates any breach of it by SAMOCO and thus the jury's finding that SAMOCO breached that agreement is legally infirm.

## I. Pleadings and Limitations

SAMOCO contends that Pecten's counterclaim for attorney's fees is barred by the statute of limitations as a matter of law because Pecten did not file its counterclaim until more than four years after SAMOCO filed this lawsuit. Pecten responds that its counterclaim relates back to its timely filed affirmative defense in its first amended answer, in which it pleaded that SAMOCO's claims were barred by its "compromise and settlement with respect to the matters alleged."

The parties advance dueling statutory provisions in support of their respective positions. For its part, SAMOCO observes that section 16.069 of the Civil Practice and Remedies Code requires counterclaims to be filed within 30 days after the party's answer to avoid a limitations bar:

> (a) If a counterclaim or cross claim arises out of the same transaction or occurrence that is the basis of an action, a party to the action may file the counterclaim or cross claim even though as a separate action

24

> it would be barred by limitations on the date that the party's answer is required.
>
> (b) The counterclaim or cross claim must be filed not later than the 30th day after the date on which the party's answer is required.

TEX. CIV. PRAC. & REM. CODE ANN. § 16.069 (West 2015).  Because Pecten did not file a counterclaim within 30-day time period, SAMOCO argues, Pecten's effort to tack the counterclaim onto its settlement and release defense must fail.  Section 16.069, however, applies to counterclaims that "would be barred by limitations on the date the party's answer is required."  Pecten's counterclaim was not barred by limitations on the date it answered the suit because it is the suit that forms the basis for Pecten's claim for breach of the settlement agreement.  Because it was not a claim barred by limitations on the date Pecten answered, but accrued only upon SAMOCO's filing of the suit, section 16.069 does not preclude Pecten's counterclaim.

Instead, section 16.068 is the applicable relation-back provision.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.068 (West 2015).  Section 16.068 provides that later amendments, including pleadings "that change[] the grounds of liability or defense" will relate back to an initial pleading, unless the pleading amendment is "wholly based on a new, distinct or different" transaction or occurrence:

> If a filed pleading relates to a cause of action, cross-action, counterclaim or defense that is not subject to a plea of limitation when the pleading is filed, a subsequent amendment . . . to the pleading that changes the facts or grounds of liability or defense is not subject to a

25

> plea of limitation unless the amendment or supplement is wholly based on a new, distinct, or different transaction or occurrence.

*Id.*; *see also Winston v. Am. Med. Int'l, Inc.*, 930 S.W.2d 945, 954 (Tex. App.— Houston [1st Dist.] 1996, writ denied) (holding that, together with section 16.064, section 16.068's "clear purpose" is to "allow adding to a petition additional theories of liability or defenses").

Pecten asserted the affirmative defense of release within the statute of limitations. Its added ground of liability, breach of the settlement agreement that released it from liability, is a ground arising from the same "transaction or occurrence" underlying Pecten's affirmative defense of release. TEX. CIV. PRAC. & REM. CODE § 16.068. Under section 16.068, Pecten's counterclaim relates back to its timely filed affirmative defense.

SAMOCO responds that section 16.068 should be limited to cases in which a party has sought affirmative relief within the limitations period and that the assertion of an affirmative defense is not enough to trigger its provisions. SAMOCO relies on a case in which our sister court of appeals held that a counterclaim does not relate back to a general denial. *See Flukinger v. Straughan*, 795 S.W.2d 779, 787 (Tex. App.—Houston [14h Dist.] 1990, writ denied). Unlike a general denial, however, the timely assertion of an affirmative defense will render a later counterclaim timely if the counterclaim and the defense are based on the same occurrence. *See Markovsky v. Kirby Tower, L.P.*, No. 01–13–00516–CV, 2015 WL 8942528, *6

26

(Tex. App.—Houston [1st Dist.] 2015, no pet.) (mem. op.). In *Markovsky*, this court held that Kirby Tower's breach of contract and declaratory judgment counterclaims related back to Kirby Tower's prior pleading of anticipatory repudiation as an affirmative defense. *Id.*

We follow *Markovsky* as a faithful interpretation of the statute. Section 16.068 expressly provides that a later filed "pleading" may relate back to a "defense." TEX. CIV. PRAC. & REM. CODE § 16.068. A defense is not a claim that is subject to limitations. Thus, the statute expressly contemplates that a claim subject to limitations can nonetheless relate back to a defense that is not itself an affirmative claim for relief. We hold that Pecten's counterclaim relates back to its defense under section 16.068. *See id.*; *Markovsky*, 2015 WL 8942528 at *6.

## III. Breach of Contract and Excuse for Failure to Perform

SAMOCO contends that its breach of the settlement agreement is excused by the jury's finding that Pecten fraudulently induced SAMOCO into entering into the agreement. A fraudulent inducement finding can support both a cause of action and an affirmative defense to enforcement of a contract. *See Koral,* 802 S.W. 2d at 651; *see also Martin v. Martin*, 287 S.W.3d 260, 266 (Tex. App.—Dallas 2009, pet. denied) (observing that "the statute of limitations does not apply to a fraud claim pleaded defensively to defeat liability on an obligation induced by fraud"). Thus,

27

the jury finding provides a basis to excuse SAMOCO from complying with the settlement agreement.

Pecten responds, however, that there is no evidence to support the jury's finding that misrepresentations relating to the 1987 fourth annex fraudulently induced SAMOCO to enter the 1989 settlement agreement. The jury rejected the other two possible fraud theories submitted for consideration. We therefore determine whether sufficient evidence supports a finding that Pecten's fraud excused SAMOCO's breach of the settlement agreement.

**A. Standard of review**

In analyzing the legal sufficiency of the evidence supporting a finding, we review the record in a light favorable to the factual findings, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). Evidence is legally sufficient if it "'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997)). We conclude that the evidence is legally insufficient to support the finding only if (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a

28

vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810 (quoting Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960)). The factfinder is the sole judge of the weight and credibility of the evidence. *Id.* at 819. We assume that the factfinder decided those questions in favor of the verdict if they reasonably could do so. *See id.* at 819–20.

The charge asked, "Did Pecten fraudulently induce [SAMOCO] to enter into the 1989 Settlement Agreement?" After instructing the jury on the legal elements of fraud, the charge identifies three sources of Pecten's representations as possible bases for finding fraud, asking the jury to answer "yes" or "no" for each of them. The jury found just one source of representations fraudulently induced SAMOCO to enter into the settlement agreement, that being

> Pecten's inclusion of language in the Fourth Annex stating that: (i) "The obligations and rights subject of this Annex shall be considered independent from the Original Service Contract;" and (ii) "It is understood that the petroleum produced and saved from the New Area and all the documents and records related to the execution of Petroleum Operations under this Annex shall be treated independently and separately from those under the Original Service Contract."

Thus, we determine whether the evidence supports a finding that the language in the fourth annex were misrepresentations intended to induce, and did induce, SAMOCO into settling with Pecten.

29

**B. The fourth annex pre-suit recitals do not excuse breach of the settlement agreement because they did not induce the settlement.**

SAMOCO was not a party to the fourth annex, which Pecten executed in October 1987—eight months before SAMOCO's 1988 lawsuit. The parties entered into the settlement agreement in May 1989. Before and after executing the fourth annex, Pecten approached SAMOCO with offers to buy out SAMOCO's royalty interest. The evidence at trial showed that Pecten inserted the language into the fourth annex to deter SAMOCO from claiming that its interest extended to the fourth annex and to induce SAMOCO into accepting Pecten's buyout offer.

Pecten argues that the misrepresentations in the fourth annex cannot present a basis for fraudulent inducement to settle the lawsuit, both because the lawsuit did not exist when the fourth annex was made and because SAMOCO was not a party to fourth annex. Pecten points out that the settlement agreement expressly recited that neither party conceded the position that the fourth annex, or any of the annexes, were independent agreements. Pecten notes that SAMOCO seeks to impose open-ended liability based on the fourth annex even though SAMOCO was not a party to the fourth annex. Pecten relies on the Texas Supreme Court's decision in *Ernst & Young, L.L.P. v. Pacific Mutual Life Insurance Co.*, 51 S.W.3d 573 (Tex. 2001), to support its contentions.

In *Ernst & Young*, the Texas Supreme Court confirmed that Texas law is consistent with the principle, set forth in section 531 of the Restatement (Second) of Torts, that "a person who makes a misrepresentation is liable to the person or class of persons the maker intends or 'has reason to expect' will act in reliance upon the misrepresentation." *Id.* at 578 (quoting RESTATEMENT (SECOND) OF TORTS § 531 (1977)). In the context of third parties who seek to rely on the misrepresentation, this standard of intent "requires a degree of certainty that goes beyond mere foreseeability." *Id.* at 579–80. "[T]he alleged fraudfeasor must 'have information that would lead a reasonable man to conclude that there is an especial likelihood that it will reach those persons and will influence their conduct.'" *Id.* at 580 (quoting RESTATEMENT (SECOND) OF TORTS § 531 cmt. d).

Section 531's similar-transaction requirement, the Texas Supreme Court continued, also circumscribes the reason-to-expect standard. *Id.* "Though the transaction sued upon need not be identical to that the defendant contemplates, it must have the same essential character: 'It may differ in matters of detail or extent, unless these differences are so great as to amount to a change in the essential character of the transaction.'" (quoting RESTATEMENT (SECOND) OF TORTS § 531 cmt. g).

SAMOCO was not a party to the fourth annex, but the jury reasonably could have concluded that Pecten, who was seeking to buyout SAMOCO's interest at the

time, had "reason to expect" that SAMOCO, even though it was not a party to the fourth annex, might rely on the statements in the fourth annex that the annex was an independent agreement. SAMOCO introduced evidence that Pecten had reason to expect that the statements in the fourth annex would reach SAMOCO and would influence its conduct in connection with Pecten's offer to purchase SAMOCO's interest. *See id.*

The same is not true for SAMOCO's settlement of its later lawsuit against Pecten, in which SAMOCO directly asserted claims for the applicability of the annexes and nonpayment of royalties under its own agreement with Pecten. The settlement of the lawsuit is not the same in essential character of a contemplated buyout. *See id.* Rather, the settlement was made in the context of a legal dispute over the whether the annexes, including the fourth annex, were independent contracts. The settlement agreement expressly disavowed "any concession as to whether the Service Contract, First Annex, Third Annex, and Fourth Annex constitute a single agreement or multiple independent agreements." Both the timing of the fourth annex representations—before any lawsuit had been filed—and the character of the later settlement—in which both parties bargained for release of the claims made in the lawsuit, including a claim that the fourth annex was not an independent contract—are differences "so great as to amount to a change in the essential character of the transaction" contemplated at the time the representations

32

were made, negating third-party reliance in that context. *See Ernst & Young*, 51 S.W.3d at 580. Because we conclude no evidence supports an inference that the misrepresentations in the fourth annex were made in contemplation of settlement of a third-party lawsuit that did not exist and for release of claims for which SAMOCO took a directly contrary position, we reject SAMOCO's contention that Pecten's fraud in connection with statements in the fourth annex excuses SAMOCO's breach of the settlement agreement found by the jury.

## III. Damages

### A. Admission of attorney's fee evidence

At the outset, SAMOCO challenges the trial court's ruling Pecten's attorney's fees evidence as an abuse of discretion. Pecten designated its lead trial attorney as its attorney's fee expert, but it did not identify the amount of fees sought or produce the billing records to support a fee award until the Friday before the Monday the case was called for trial. The trial court allowed the evidence.

When a party has not timely made, amended, or supplemented a discovery response, it may not introduce into evidence the material or information that was not timely disclosed unless the trial court finds that there was good cause for the failure to timely make the discovery response or the failure to timely make the discovery response will not unfairly surprise or unfairly prejudice the other parties. TEX. R. CIV. P. 193.6(a). A disclosure is presumed to be untimely if it was made less than

33

30 days before trial. *Id.* 193.5(b). The party seeking to introduce the evidence has the burden of establishing good cause or the lack of unfair surprise or prejudice. *Id.* 193.6(b). The trial court has broad discretion to determine whether the party has met this burden. *See Dyer v. Cotton*, 333 S.W.3d 703, 717 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Dolenz v. State Bar of Tex.*, 72 S.W.3d 385, 387 (Tex. App.—Dallas 2001, no pet.).

Courts have held that a trial court does not abuse its discretion in admitting testimony by an untimely designated attorney's fees expert when, as here, the party's pleadings contained a request for attorney's fees well before trial. *See, e.g.*, *Rhey v. Redic*, 408 S.W.3d 440, 459 (Tex. App.—El Paso 2013, no pet.) (holding that trial court did not abuse its discretion in admitting testimony from late-designated attorney's fees expert where plaintiff requested attorney's fees in petition filed five months before trial); *Beard Fam. P'ship v. Comm'l Indem. Ins. Co.,* 116 S.W.3d 839, 850 (Tex. App.—Austin 2003, no pet.) (holding that trial court did not abuse its discretion in admitting testimony from untimely designated attorney's fees expert where party requested attorney's fees in initial petition). SAMOCO had notice that the damages Pecten sought were the attorney's fees that Pecten had incurred through the litigation.

When SAMOCO objected to the proffered attorney's fee testimony, the trial court ordered Pecten's witness to make himself available for deposition so that

SAMOCO could discover facts necessary to defend against the fee claim. SAMOCO did not seek a continuance of trial. Under these circumstances, we hold that the trial court did not abuse its discretion in admitting the attorney's fee evidence supporting Pecten's counterclaim. *See*, *e.g.*, *Wigfall v. Tex. Dep't of Crim. Justice*, 137 S.W.3d 268, 274 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (holding that trial court did not abuse its discretion in not excluding late-designated expert witness where party who sought exclusion did not request continuance or complain that delay left him unable to conduct his own discovery).

## B. Factual sufficiency of attorney's fee evidence

Pecten's evidence in support of the damages element of its breach of contract claim consisted of the attorney's fees that Pecten incurred in defending itself against SAMOCO's claims. When an underlying suit concerns a claim for attorney's fees as an element of damages, those fees are recoverable as compensatory damages. *In re Nalle Plastics Fam. Ltd. P'ship*, 406 S.W.3d 168, 175 (Tex. 2013). Pecten proffered two witnesses in support of its claim for fees, its corporate representative and its trial attorney.

Pecten's corporate representative, Gary Cameron, testified that Pecton was impacted by the lawsuit in this case by an amount of $3.5 million, including attorney's fees, expert fees, and costs:

> Q: Has Pecten been impacted by the SAMOCO Panama lawsuit in this case?

35

A. Yes, sir.

Q: In what way?

A. $3.5 million.

Q. How much?

A. $3.5 million plus.

Q. And that represents what?

A. That represents a combination of the experts' costs to support the defense, as well as legal fees and costs of Norton Rose to defend this case.

Pecten's trial attorney, William Wood, testified about the fees that his firm charged for its services in this case. Wood testified that Shell Oil Company paid these fees, but those payments were "charge[d] out" to Pecten. The trial court admitted detailed invoices reflecting attorney's fees incurred in defending the case. The invoices are directed to Pecten Orient Company and Shell Oil Company.

Wood testified that the invoices billed to Pecten at the time of trial totaled $3,069,864.75 in attorney's fees. The summary of legal fees and invoices admitted into evidence at trial show an additional $170,453.79 incurred as costs. Wood further testified that Pecten would incur an additional $300,000 in attorney's fees and $30,000 in costs that had not been invoiced.

Pecten contends that the jury's zero verdict is against the great weight and preponderance of the evidence because the testimony regarding fees was uncontroverted. SAMOCO responds that Pecten's evidence regarding attorney's fees was not "free from contradiction," because Wood acknowledged that Shell Oil

Company was listed as an addressee on the invoices and paid them. SAMOCO did not proffer controverting evidence, nor does it substantively challenge the attorney's fee evidence on appeal.

SAMOCO's argument ignores that the invoices list Pecten as an addressee and that Wood testified that the fees were charged to Pecten. Cameron's testimony further established that Pecten paid the fees. No witness testified to the contrary. Rather, all of the evidence at trial was that Pecten was the entity responsible for paying the fees incurred in this suit. "The jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony." *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). Jurors may disregard uncontroverted and unimpeached testimony, but they "cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *City of Keller*, 168 S.W.3d at 820.

While the jury could have rejected some amount of the attorney's fees that Pecten incurred as unreasonable or unnecessary, its rejection of any amount is against the weight of the evidence. "[W]here the evidence of an injury is uncontroverted, the fact finder may determine the extent of injury and the appropriate amount of damages to be awarded based on the facts, but it may not ignore uncontroverted evidence by completely denying recovery." *Schwartz v.*

37

*Pinnacle Commc'ns*, 944 S.W.2d 427, 436 (Tex. App.—Houston [14th Dist.] 1997, no writ) (emphasis omitted). The testimony and documentary evidence regarding fees in this case was undisputed, clear, and direct; the record contained no conflicting testimony. *See City of Keller*, 168 S.W.3d at 820. That evidence established that Pecten incurred some amount of attorney's fees as damages for breach of the settlement agreement. Thus, while the jury could have determined that a portion of the fees that Pecten sought were not reasonable or necessary, we hold that its determination that none should be awarded is against the great weight and preponderance of the evidence. *See id.* We therefore reverse the trial court's judgment on Pecten's counterclaim for breach of contract and remand that claim for a new trial. *See* TEX. R. APP. P. 44.1(b) ("The court may not order a separate trial solely on unliquidated damages if liability is contested.").

## CONCLUSION

We hold that the trial court properly entered judgment against SAMOCO's claims for fraud based on the jury's findings and the applicable statute of limitations. We further hold that the trial court properly granted summary judgment on SAMOCO's claim for breach of contract in connection with the deep and lateral agreement. We further hold that SAMOCO's breach of the settlement agreement, as found by the jury, is not excused by the jury's other finding that Pecten fraudulently induced SAMOCO into entering the settlement agreement and is not

38

barred by limitations.  Finally, we hold that the jury's finding that Pecten sustained nothing in damages as a result SAMOCO's breach of the settlement agreement is not supported by the uncontroverted evidence.    Accordingly, we affirm the judgment of the trial court that SAMOCO take nothing on its claims and reverse and remand Pecten's claim for breach of the settlement agreement for a new trial.


Jane Bland
Justice

Panel consists of Justices Bland, Massengale, and Lloyd.