ACCEPTED
04-17-00285-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
9/25/2017 3:43 PM

NO. 04-17-00285-CV

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
09/25/2017 3:43:14 PM
KEITH E. HOTTLE
CLERK

IN THE COURT OF APPEALS
FOR THE FOURTH DISTRICT OF TEXAS
SAN ANTONIO, TEXAS

MEDICAL IMAGING SOLUTIONS GROUP, INC. OF TEXAS,
Appellant,

v.

WESTLAKE SURGICAL, LP D/B/A THE HOSPITAL AT WESTLAKE
MEDICAL CENTER AND WS GP, LLC,
Appellees.

ORIGINAL BRIEF OF APPELLEES
WESTLAKE SURGICAL, LP D/B/A THE HOSPITAL AT
WESTLAKE MEDICAL CENTER AND WS GP, LLC

ON APPEAL FROM THE 224TH JUDICIAL DISTRICT COURT
OF BEXAR COUNTY, TEXAS
TRIAL COURT CAUSE NO. 2014-CI-06112

Date: September 25, 2017

{1737446;}

DAVID L. BRYANT
State Bar No. 24084344
dbryant@gablelaw.com
GABLEGOTWALS
113 Pleasant Valley Drive, Suite 204
Boerne, Texas 78006
(830) 336-4810
(918) 595-4990 (facsimile)

R. CHAD GEISLER
State Bar No. 00793793
cgeisler@germer-austin.com
GERMER BEAMAN & BROWN, LLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701
(512) 472-0288
(512) 472-0721 (facsimile)

ATTORNEYS FOR APPELLEES
WESTLAKE SUGICAL, LP D/B/A THE
HOSPITAL AT WESTLAKE MEDICAL
CENTER AND WS GP, LLC

# TABLE OF CONTENTS

Index of Authorities ................................................................................ ii

I.    Statement of the Case ....................................................................2

II.   Statement of Facts.........................................................................2

III.  Summary of the Argument ...........................................................11

IV.   Argument and Authority...............................................................12

      A.   Response to Point of Error No. 2 and No. 3.......................................13

      B.   Response to Point of Error No. 4 and No. 5.......................................19

      C.   Response to Point of Error No. 6 ......................................................22

      D.   Response to Point of Error No. 1 ......................................................25

V.    Conclusion and Prayer.................................................................30

Certificate of Compliance .......................................................................32

Certificate of Service ..............................................................................32

# INDEX OF AUTHORITIES

## Cases

*Baytown State Bank v. Don McMillan Leasing Co.*,
   551 S.W.2d 771 (Tex. App.-Houston [14th Dist.] 1977, writ
   ref'd n.r.e.) ......................................................................................................18

*Bed, Bath & Beyond, Inc. v. Urista*,
   211 S.W.3d 753 (Tex. 2006) ..................................................... 30, 31, 32, 33

*Bodiford v. Parker*, 651 S.W.2d 338 (Tex. App.-Fort Worth 1983, no
   writ)..................................................................................................................27

*Boyles v. Kerr*,
   855 S.W.2d 593 (Tex. 1993) ...........................................................................16

*Continental Cas. Co. v. Boerger*,
   Tex.Civ.App, 389 S.W.2d 566 ........................................................................18

*Continental Homes of Texas, L.P. v. City of San Antonio*,
   275 S.W.3d 9 (Tex. App.-San Antonio 2008, pet. denied) ...........................17

*Crosstex Energy Servs., L.P. v. ProPlus, Inc.*, 430 S.W.3d 384 (Tex.
   2014) ................................................................................................................27

*Crown Life Ins. Co. v. Casteel*,
   22 S.W.3d 378 (Tex. 2000) ............................................................ 32, 33, 34

*El Paso Refining, Inc. v. Scurlock Permian Corp.*,
   77 S.W.3d 374 (Tex. App.-El Paso 2002, pet. denied) ......................... 13, 33

*Ford Motor Co. v. Castillo*,
   444 S.W.3d 616 (Tex. 2014) ...........................................................................32

*G.H. Bass & Co. v. Dalsan Properties-Abliene*,
   885 S.W.2d 572 (Tex. App.-Dallas 1994, no writ) ......................................27

*Hammer v. Dallas Transit Co.*,
   400 S.W.2d 885 (Tex. 1966) ...........................................................................18

*Hampton v. Minton*,
   785 S.W.2d 854 (Tex. App.-Austin 1990, writ denied) ......................... 18, 19

*Harris County v. Smith*,
   96 S.W.3d 230 (Tex. 2002) ................................................................ 31, 32

*Henry v. Masson*,
   333 S.W.3d 825 (Tex. App.-Houston [1st Dist.] 2010, pet
   denied) ...................................................................................................19

*Hodge v. Smith*,
   856 S.W.2d 212 (Tex. App.-Houston [1st Dist.] 1993, writ
   denied) ...................................................................................................16

*In Interest of M.G.N.*,
   491 S.W.3d 386 (Tex. App.-San Antonio 2016, pet. denied) .......................17

*Interceramic, Inc. v. South Orient R.R. Co., Ltd.*,
   999 S.W.2d 920 (Tex. App.-Texarkana 1999, pet. denied) .........................26

*Kellogg Brown & Root Int'l, Inc. v. Altanmia Commercial Mktg. Co.
   W.L.L.*,
   No. H-07-2684, 2008 WL 5114962 (S.D. Tex. Dec. 3, 2008,
   not reported in F.Supp.2d) ........................................................................23

*Larsen v. FDIC/Manager Fund*,
   835 S.W.2d 66 (Tex. 1992) .......................................................................26

*Massachusetts Bonding & Ins. Co. v. Orkin Exterminating Co.*,
   416 S.W.2d 396 (Tex. 1967) .....................................................................26

*McGowan v. Pasol*,
   605 S.W.2d 728 (Tex.App-Corpus Christi 1980, no writ) ..................... 27, 29

*Missouri-Kansas-Texas R. Co. v. Alvarez*,
   703 S.W.2d 367 (Tex. App.-Austin 1986, writ ref'd n.r.e.)
   (Smith, J., dissenting) ...............................................................................15

*New York Party Shuttle, LLC v. Bilello*,
   414 S.W.3d 206 (Tex. App.-Houston [1st Dist.] 2013, pet.
   denied....................................................................................................19

*Okemah Constr., Inc. v. Barkley-Farmer, Inc.*,
   583 S.W.2d 458 (Tex. App.-Houston [1st Dist.] 1979, no writ)............. 23, 24

*Reinhart v. Young*,
906 S.W.2d 471 (Tex. 1995) ........................................................33

*Roark v. Allen*,
633 S.W.2d 804 (Tex. 1982) ........................................................10

*Seaureau v. Tanglewood Homes Ass'n, Inc.*,
694 S.W.2d 119 (Tex. App.-Houston [14th Dist.] 1985, writ
ref'd n.r.e.) .................................................................................16

*Southwestern Bell Tele. Co. v. Garza*,
164 S.W.3d 607 (Tex. 2004) ........................................................17

*State Dep't of Highways & Pub. Transp. v. Payne*,
838 S.W.2d 235 (Tex. 1992) ........................................................13

*State of Cal. Dep't of Mental Hygiene v. Bank of Southwest Nat'l
Ass'n*,
354 S.W.2d 576 (Tex. 1962) ........................................................22

*Stone v. Lawyers Title Ins. Corp.*,
554 S.W.2d 183 (Tex. 1977) .................................................. 14, 15

*Syrian American Oil Corp., S.A. v. Pecten Orient Co.*,
No. 01-15-00424-CV, 2017 WL 1955403 (Tex. App.-Houston
[1st Dist.] May 11, 2017, no pet.)................................................16

*T.O. Stanley Boot Co., Inc. v. El Paso*,
847 S.W.2d 218 (Tex. 1992) .................................................. 14, 22

*The Huff Energy Fund, L.P. v. Longview Energy Co.*,
482 S.W.3d 184 (Tex. App.-San Antonio 2015, pet. granted)......15

*Thota v. Young*,
366 S.W.3d 678 (Tex. 2012) ........................................................32

*United Concrete Pipe Corp. v. Spin-Line Co.*,
430 S.W.2d 360 (Tex. 1968) ........................................................24

## Other Authorities

BLACK'S LAW DICTIONARY 1303 (6th ed. 1990) .......................................16

## Rules

TEX. R. APP. P. 38.2(a)(2) ............................................................................12

TEX. R. APP. P. 61.1(a) ...............................................................................26

TEX. R. CIV. P. 274......................................................................................13

TEX. R. CIV. P. 277......................................................................................26

TEX. R. CIV. P. 278......................................................................................26

TEX. R. CIV. P. 45, 47.................................................................................14

TEX. R. CIV. P. 71........................................................................................15

TEX. R. CIV. P. 90 & 91..............................................................................10

IN THE COURT OF APPEALS
FOR THE FOURTH DISTRICT OF TEXAS
SAN ANTONIO, TEXAS

MEDICAL IMAGING SOLUTIONS GROUP, INC. OF TEXAS,
Appellant,

v.

WESTLAKE SURGICAL, LP D/B/A THE HOSPITAL AT WESTLAKE
MEDICAL CENTER AND WS GP, LLC,
Appellees.

**TO THE HONORABLE COURT OF APPEALS:**

Appellees, Westlake Surgical, LP d/b/a The Hospital at Westlake Medical Center and WS GP, LLC (collectively "**Westlake**"), respectfully submit their Original Brief in response to the Original Brief of Appellant Medical Imaging Solutions Group, Inc. of Texas ("**MIS**") filed herein on August 24, 2017, and request the Court of Appeals to AFFIRM the take-nothing Judgment entered by the 224th Judicial District Court of Bexar County, Texas ("**Trial Court**") in Cause No. 2014-CI-06112. In the proceedings below, MIS was the Plaintiff, and Westlake was the Defendant/Counterclaimant. Westlake shows this Honorable Court as follows:

## I.    STATEMENT OF THE CASE

1.    Westlake submits this Statement of the Case to correct a misstatement in MIS's statement. MIS suggests that the Jury found against Westlake on both its breach of contract and fraud counterclaims. *See* Appellant Br. at 2, ¶ 1 ("The jury also found against Westlake on its counterclaims."). However, in Question No. 2 of the Jury Charge, the Jury determined that MIS had breached the Asset Management Agreement (CR 2992). Westlake proffered evidence of its damages arising from MIS's breach (DX 55). The remainder of MIS's Statement of the Case fairly reflects the litigation history.

## II.    STATEMENT OF FACTS

MIS's Statement of Facts is supplemented with the additional facts below, which are relevant to the Court's consideration of the six purported errors raised in MIS's brief:

2.    On March 11, 2011, MIS and Westlake executed an Asset Management Contract ("**Agreement**") under which MIS was designated the "exclusive" service provider for equipment covered under the Agreement (DX 1 [WLP 193,200]). Westlake elected to cover its MRI, nuclear medicine camera, and Philips Brilliance 16 CT under the Agreement (DX 1[WLP 201]). The Agreement obligated MIS to maintain the equipment in compliance with original equipment manufacturer ("**OEM**") specifications (DX 1 [WLP 193, 195]). The monthly cost for the service

was $16,729. The Agreement required MIS to charge interest on delinquent payments (DX 1 [WLP 195-96]). Delinquent payments were an event of default under the Agreement (DX 1[WLP 196]). The Agreement also provided that "[n]o waiver, alteration or modification of any of the provisions hereof shall be binding upon MIS unless in writing and signed on its behalf by MIS Executive Officers" (DX 1 [WLP 200]).

3.      Contrary to the "exclusive" service provider provision of the Agreement, MIS contracted with a bevy of third-party vendors to provide service to Westlake's equipment during the term of the Agreement (DX 38-42). Although MIS claims Westlake's payment under the Agreement was delinquent from its execution, MIS did not declare a default until Westlake declined to accede to MIS's wrongful demand for an unnecessary part replacement (RR Bates, v.7, p.92; DX 34), and never charged interest as required by the Agreement.

4.      Almost immediately after executing the Agreement, MIS required the assistance of Philips, as the OEM, to repair Westlake's CT, which was covered under the scope of the Agreement (RR Hagan, v.4, pp.168-74;DX 2 [MIST 100-103]). Philips charged Westlake $35,761.04, excluding tax, for this covered repair (DX 2 [MIST 407-410]). MIS made payment to Philips for this repair of the CT (DX 2 [MIST 431]).

5.     Under the term of the Agreement, Westlake's payment was owed on the first day of the month (DX 1[WLP 195]). In an email dated December 17, 2013, MIS's Vice President, Robert "Bobby" Hagan, informed Westlake that 60-day payment terms were acceptable to MIS (DX 21 [MIST 458-59]). In correspondence dated December 23, 2013, MIS's CFO, Vivian Bates, confirmed Mr. Hagan's prior communication that 60-day payment terms were acceptable to MIS (DX 23 [WLP 39-40]). On December 23, MIS claimed that Westlake owed $58,898.94 under the Agreement (DX 23 [WLP 39-40]). Between December 23 and February 11, 2014, Westlake paid MIS $61,228.41 (RR Jefferson, v.5., pp.118-20; DX 48). In an email dated January 16, 2014, with a subject line stating "RE: Hospital of Westlake Payment Plan Agreement 01-13-2013," Mr. Hagan again informed Westlake that 60-day payment terms were acceptable to MIS (DX 24 [MIST 450-51]; RR Bates, v.7, pp.141-42). Based on these communications from two MIS executives, Westlake understood that the payment terms under the Agreement were 60 days (RR Jefferson, v.5, pp.91-93). The 60-day payment terms did not change thereafter (RR Jefferson, v.5, p.99).

6.     Mr. Hagan's January 16 communication also proposed a payment plan of approximately $5,500 per week (DX 24 [MIST 450-51]). Westlake accepted and confirmed the payment plan proposal in an email communication dated January 21, 2014, stating: "We should be able to pay the $5500 per week beginning this week.

Our check runs are on Thursdays each week" (DX 24 [WL 2895]). On the following day, Westlake confirmed acceptance of the payment plan: "I will be paying $5575 per week until we are current" (DX 24 [MIST 1014]). Westlake subsequently made payments of: (a) $5,575.00, received by MIS on January 30, 2014; (b) $5,575.00, received by MIS on February 5, 2017; and (c) $5,579.13, received by MIS on February 11, 2014 (DX 48 [MIST 741]). At trial, Mr. Hagan confirmed Westlake's acceptance and performance of the payment plan (RR Hagan, v.4, pp.100-01).

7.    On January 21, 2014, MIS responded to a call on Westlake's Philips Brilliance 16 CT, which had gone down. (DX 26 [MIST 398]). On January 23, 2014, MIS replaced the anode power module ("**APM**") on the CT—a repair covered under the Agreement (DX 26 [MIST 396]). After the repair, the CT was functional for a few days before crashing again on January 27, 2014 (DX 26 [MIST 399]). MIS told Westlake that the x-ray tube on the CT would need to be replaced (RR Jefferson, v.6, p.38). The cost of an x-ray tube was approximately $90,000 to $200,000, depending on the condition of replacement tube (i.e., refurbished versus new) (RR Hagan, v.4, p.190). Because the x-ray was outside the scope of the Agreement, Westlake sought a second opinion from Philips, regarding the need for a new x-ray tube (RR Jefferson, v.6, pp.40-41). MIS was aware of Westlake's desire to obtain a second opinion on the tube issue and requested to have someone present (RR Jefferson, v.6, pp.40-44).

8.     Philips determined that the APM installed by MIS on January 23, 2014, was defective, that Westlake did not need a new x-ray tube, and that the proper repair was installation of a non-defective APM—a part and repair covered under the Agreement (RR Jefferson, v.6, p.40-44; DX 31 [WLP 593]). Notwithstanding the OEM's recommendation, MIS refused to replace its defective APM, unless Westlake agreed to unnecessary replacement of the x-ray tube (RR Hagan, v.4, pp.141-46). On January 30, 2014, Philips replaced MIS's defective APM, charging Westlake $49,564.23 for the repair (RR Jefferson, v.5, p.149; DX 26 [MIST 400]; DX 31). Westlake informed MIS that, if Philips' recommendation corrected the problem, Westlake expected payment from MIS for cost of the covered repair (RR Jefferson, v.6, p. 43). MIS inspected the CT on February 3 and 4, 2014, confirming on both occasions, "System is fully functional and meets OEM specification" (DX 26 [MIST 399, 402]).

9.     Throughout the term of the Agreement, MIS consistently expressed to Westlake how it valued the "good relationship" with Westlake (DX 14 [MIST 511]). As of late-January 2014, MIS still recognized the value of the "good relationship" with Westlake (DX 24 [MIST 1014]) (RR Hagan, v.4, pp.179-80). However, MIS did not perform any other service on Westlake's equipment after the late-January "blowup" over the CT repair (RR Hagan, v.4, pp.138, 217-19). MIS's refusal to perform service was not conditioned on receipt of any payment from Westlake, but

rather on Westlake's agreement to the unnecessary x-ray tube replacement (RR Jefferson, v.5, pp.55, 59-62). Westlake made payments on the agreed payment plan after the "blowup" (RR Jefferson, v.6, p. 30; DX 48).

10. On February 28, 2014, Westlake requested MIS to pay the $49,564.23 charged by Philips for the covered repair to the CT, as MIS had done with the Philips' similar repair at the beginning of the parties' relationship (DX 47). Westlake also informed MIS, "We will continue with the agreed upon weekly payments of $5,575.00 until current" (DX 47).

11. At trial, Mr. Hagan acknowledged his prior deposition testimony that recommendation and insistence of an unnecessary repair would be a breach of MIS's obligations under the Agreement (RR Hagan, v.4, pp.200-01). The Jury heard Mr. Hagan's testimony regarding MIS's response to Westlake's February 28 request for reimbursement for the covered repair performed by Philips: (a) "Nah, we're just done" (RR Hagan, v.4, p.131); (b) "You know, this is it. I mean, we get a letter saying this is what you're gonna do, and we're crediting this, we just had it" (RR Hagan, v.4, p.132); (c) "we just need to end it," referring to the Agreement (RR Hagan, v.4, p.122); (d) "We're done" (RR Hagan, v.4, p. 184); and (e) "That's it, we're just done" (RR Hagan, v.4, p. 218). Mr. Hagan testified that MIS took this position "right after [MIS] had made the determination that that's [referring to

Philips' replacement of the defective APM] not what's going to fix the problem" with the CT (RR Hagan, v.4, p.133).

12. On Sunday, March 2, 2014, the computer/graphics card on Westlake's CT went down, and Westlake requested service from MIS, which was entered into MIS's system as Ticket No. 023920 (RR Jefferson, v.5, pp.97-98; DX 36). On Monday, March 3, Westlake followed up on the status of Ticket No. 023920, again informing MIS, that "[s]hould MIS decide to resume service, WLMC [Westlake] will resume the agreed upon weekly payments until caught up" (RR Jefferson, v.5, pp.97-98; DX 35). MIS did not respond to Westlake's request for service in Ticket No. 023920 on Sunday or in the follow up communication on Monday (RR Jefferson, v.5, pp.97-98).[1]

13. Instead, MIS sent Westlake a rapid succession of letters. On March 3, 2014, Vivian Bates, CFO, sent a letter alleging a past due balance of $87,276.02 (DX 46). MIS's service manager, Eyad Albakri, sent a second letter to Westlake on March 3, asserting that the "tube might be the cause of the problem" with the CT in January and refusing to pay the Philips' invoice (DX 33). On March 4, 2014, Ms. Bates sent a default notice to Westlake, again asserting that Westlake was delinquent in the amount $87,276.02 for charges through March 1, 2014 and accelerating the agreed

---

[1] Philips subsequently made the repair at a cost of $7,836.22 to Westlake (RR Jefferson, v.5, p.98).

60-day payment terms to a mere ten days to avoid legal action (RR Bates, v.7, p.92; DX 34).[2] The March 4 correspondence was MIS's first default notice during the term of the Agreement, coming approximately one month after MIS informed Westlake that it would not service Westlake's equipment (RR Hagan, v.4, p.217-19).

14. After MIS's refusal to service Westlake's equipment, commencing with its refusal to replace the defective APM installed on January 23, 2014, Westlake paid Philips $368,050.94 to service its equipment between January 2014 and February 2016 (DX 55).

15. MIS initiated litigation against Westlake in the Trial Court on April 16, 2014 (CR 18-35). Westlake's Original Answer and Counterclaim to Plaintiff's Amended Original Petition was filed August 22, 2014 (CR 95-106). Westlake's Supplemental Answer to Plaintiff's Third Amended Petition and Defendant's Original Counterclaim, filed August 3, 2015 (CR 1221-1233), alleged that MIS, *inter alia*, failed to service Westlake's equipment up to OEM standards (CR 1224,

---

[2] On December 23, 2013, MIS claimed that Westlake owed $58,898.94. Westlake would have been billed for monthly services of $16,729 from January through March 2014, adding an additional $50,187.00 to the total. From December 23 through mid-February, Westlake paid MIS $61,228.41. The math in the March 4 default notice does not work: $58,898.04 + $50,187.00 - $61,228.41 = $48,856.63. Of the $48,856.63, the monthly service fees for February and March were not then due under the 60-day payment terms agreed by the parties, leaving a balance of $14,398.63. However, MIS owed Westlake $49,564.23 for Philips' repair of the CT in late-January. On March 4, MIS actually owed Westlake the difference between the Philips' and the purportedly "past due" balance of $14,398.63. Alternatively, ignoring the 60-day payment terms (as MIS did in its March 4 demand), the parties were effectively even on March 4. At trial, the Jury heard similar testimony from MIS's expert (RR Erickson, v.8, pp.153-54, 159-61, 163, 165-67, 172-73, 175-76).

1230) and refused to perform repairs within the scope of the Agreement (CR 1227, 1230).[3]

16.     After the close of evidence, MIS's objection to the repudiation defense in Question No. 3 was limited to the purported lack of pleading the issue: "There is not pleading to support prior repudiation …," omitting any evidentiary challenge to the issue (RR Shelton, v. 9, p.115). MIS did not expressly object to the waiver or modification defenses contained in Question No. 3, instead limiting its objection the purported lack of evidence in support of a generic "excuse" defense (RR Shelton, v.9, p.115-18).

17.     During Westlake's closing argument, counsel made express reference to MIS's refusal to provide service under the Agreement: "You may think, well, the breach is a few weeks later—a few days later when they said, 'We're not going to come back until you replace the CT tube'" (RR Geisler, v.9, pp.202-03).

18.     After weighing the evidence, the Jury determined in Question No. 1 that Westlake had failed to comply with the Agreement (CR 2992), in Question No. 2 that MIS had failed to comply with the Agreement (CR 2992), and in Question No. 3 that Westlake's failure to comply was excused (CR 2993). MIS's appeal is limited exclusively to purported errors in Question No. 3. *See* Appellant Brief at 3.

---

[3]     MIS never specially excepted to Westlake's pleadings or affirmative defenses. *See* TEX. R. CIV. P. 90 & 91; *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982) (waiving any defect in the pleadings not specially excepted).

## III. SUMMARY OF THE ARGUMENT

19. Repudiation was properly included in Question No. 3, excusing Westlake's non-performance of the Agreement. By definition, repudiation is a party's unjustified refusal to perform its obligations under the parties' contract. MIS's unjustified refusal to perform its obligations under the Agreement was an issue in the parties' dispute from the very beginning. Westlake's pleading and other filings in the case contained allegations regarding MIS's refusal, and the refusal issue was actively litigated.

20. Although MIS did not challenge the sufficiency of the evidence in the Trial Court supporting its repudiation of the Agreement, the record contains evidence from which the Jury could have reasonably concluded that MIS repudiated the Agreement, refusing to perform services covered under the Agreement both in January and March 2014.

21. MIS did not expressly object to the modification defense in the Trial Court, instead making a broad objection to "excuse" issues. Accordingly, MIS did not raise either its current objections, based on a purported lack of consideration or lack of evidence, in the Trial Court. Notwithstanding MIS's waiver of the new arguments raised on appeal, the evidence demonstrates that the parties' January 2014 payment plan modification was supported by an MIS's offer, Westlake's acceptance, an exchange of consideration, and Westlake's performance.

22.    Similarly, MIS did not make an express objection to the waiver issue included in Question No. 3, subsuming it into the "excuse" objection. Nonetheless, the record contains evidence from which the Jury could have reasonably concluded that MIS waived—both expressly and by implication—the payment term provisions of the Agreement.

23.    Question No. 3 was properly submitted for the Jury's consideration and did not result in an improper verdict or judgment. The *Casteel* challenge made by MIS on appeal was not made in the Trial Court. The circumstances present in this matter do not support a finding of presumptive error under *Casteel*. Instead, each of the issues contained in Question No. 3 was legally valid, within the scope of Westlake's pleadings, and supported by competent evidence at trial.

## IV.    ARGUMENT AND AUTHORITY

Although TEX. R. APP. P. 38.2(a)(2) expresses a preference for the appellee's brief to address the appellant's points of error in the order presented, such ordering is not practicable in this particular case, because the MIS's Point of Error No. 1 is premised upon its other five putative errors. Accordingly, Point of Error 1 will be addressed last. The other points will be addressed in the order in which they appear in MIS's brief.

With regard to each putative error, Westlake contends MIS waived any objection to Question No. 3 by failing to specifically object to issues contained in

Question No. 3 in the Trial Court (RR Shelton, v.9, pp.115-17) and for raising new issues for the first time on appeal. *See State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 242 (Tex. 1992) ("An objection to the charge must distinctly point out the objectionable matters and grounds of the objection. An objection is insufficient to preserve error if it fails to adequately explain why an instruction is legally incorrect."); *El Paso Refining, Inc. v. Scurlock Permian Corp.*, 77 S.W.3d 374, 383 (Tex. App.-El Paso 2002, pet. denied) (noting that a "party is confined to the jury instruction made at trial; any variant complaint on appeal is waived"); TEX. R. CIV. P. 274.

## A. RESPONSE TO POINT OF ERROR NO. 2 AND NO. 3

The Trial Court did not err in submitting the repudiation issue to the Jury. Repudiation of a contract is a refusal of a party to perform its obligations under the contract. Westlake's pleadings in this case contained allegations that MIS refused to perform its obligations under the Agreement. These allegations were supported at trial by evidence[4] that MIS refused to perform its obligations, unless Westlake agreed to an unnecessary $200,000 part for its CT. MIS's refusal to perform was a

---

[4] As noted above, MIS's objection to the repudiation issue was limited to its contention that Westlake did not plead the issue (RR Shelton, v. 9, pp.115). If the issue was not waived by MIS, in reviewing a no evidence point of error, the Court should consider only the evidence that supports the jury's take-nothing verdict, ignoring all contrary evidence. *See T.O. Stanley Boot Co., Inc. v. El Paso*, 847 S.W.2d 218, 221 (Tex. 1992).

repudiation of the Agreement. Accordingly, the repudiation issue was properly included in Question No. 3.

24.    MIS's reliance on the trial by consent doctrine is misplaced. "Pleadings are sufficient under the Rules of Civil Procedure if they give fair and adequate notice to their adversary." *Stone v. Lawyers Title Ins. Corp.*, 554 S.W.2d 183, 186 (Tex. 1977). The adversary must simply be given fair notice of the issues in the lawsuit. *See* TEX. R. CIV. P. 45, 47. "The general rule is that broad pleadings to which no special exceptions have been properly lodged are to be given a liberal construction." *Missouri-Kansas-Texas R. Co. v. Alvarez*, 703 S.W.2d 367, 376 (Tex. App.-Austin 1986, writ ref'd n.r.e.) (Smith, J., dissenting); *see Stone*, 554 S.W.2d at 186 (noting that, "in the absence of special exceptions, the petition will be construed liberally in the pleader's favor"); *The Huff Energy Fund, L.P. v. Longview Energy Co.*, 482 S.W.3d 184, 221-22 (Tex. App.-San Antonio 2015, pet. granted) (Chapa, J. dissenting) (explaining that theories not expressly pled are not waived under notice pleading standards). As noted above (*see* discussion, *supra*, note 3), MIS did not specially except to Westlake's pleadings, thereby requiring Westlake's pleadings to be liberally construed. In such event, the pleadings should be upheld as to any issue "that may be reasonably inferred from what is specifically stated." *Boyles v. Kerr*, 855 S.W.2d 593, 601 (Tex. 1993).

25. Furthermore, the trial court may treat a counterclaim as an affirmative defense. *See Seaureau v. Tanglewood Homes Ass'n, Inc.*, 694 S.W.2d 119, 120 (Tex. App.-Houston [14th Dist.] 1985, writ ref'd n.r.e.) (citing TEX. R. CIV. P. 71); *see Hodge v. Smith*, 856 S.W.2d 212, 214 n.1 (Tex. App.-Houston [1st Dist.] 1993, writ denied) (noting that the trial court is "to look at the substance of the pleading and proceedings to determine what actually occurred"). Findings by the Jury may "support both a cause of action and an affirmative defense to enforcement of a contract." *Syrian American Oil Corp., S.A. v. Pecten Orient Co.*, No. 01-15-00424-CV, 2017 WL 1955403, at *11 (Tex. App.-Houston [1st Dist.] May 11, 2017, no pet.) (recognizing fraudulent inducement as a claim and defense).

26. Trial by consent applies only to trial of issues omitted from the parties' pleadings. *See Continental Homes of Texas, L.P. v. City of San Antonio*, 275 S.W.3d 9, 16 (Tex. App.-San Antonio 2008, pet. denied). The refusal/repudiation issue was alleged in Westlake's pleadings and litigated from the beginning of the dispute. *See Southwestern Bell Tele. Co. v. Garza*, 164 S.W.3d 607, 616-17 (Tex. 2004). The Jury heard extensive evidence on the issue of MIS's refusal to perform its obligations under the Agreement. *Cf. In Interest of M.G.N.*, 491 S.W.3d 386, 406 (Tex. App.-San Antonio 2016, pet. denied). Likewise, Westlake's closing argument directed the Jury's attention to MIS's unjustified refusal to perform (RR Geisler, v.9, pp.202-03). *See Continental Homes*, 275 S.W.3d at 16. MIS cannot reasonably argue that it did

not have fair notice of refusal/repudiation issue or that it was surprised by it. *See Hammer v. Dallas Transit Co.*, 400 S.W.2d 885, 889 (Tex. 1966).

27.     A contract may be repudiated expressly or by a party's material breach of the contract. *See Hampton v. Minton*, 785 S.W.2d 854, 858 (Tex. App.-Austin 1990, writ denied). "Repudiation may consist of words or actions that indicate an intention not to perform in the future." *Baytown State Bank v. Don McMillan Leasing Co.*, 551 S.W.2d 771, 774 (Tex. App.-Houston [14th Dist.] 1977, writ ref'd n.r.e.); *see* BLACK'S LAW DICTIONARY 1303 (6th ed. 1990) ("Such consists in such words or actions by contracting party as indicate that he is not going to perform his contract in the future. *Continental Cas. Co. v. Boerger*, Tex.Civ.App, 389 S.W.2d 566, 568)".

28.     Repudiation is in the nature of a breach of contract manifested by a refusal to perform contractual obligations without just cause. *See New York Party Shuttle, LLC v. Bilello*, 414 S.W.3d 206, 216 (Tex. App.-Houston [1st Dist.] 2013, pet. denied). A party may be found to have repudiated a contract where the other party has previously breached it: "If the non-breaching party continues to insist on performance by the party in default, the previous breach by the breaching party is not an excuse for non-performance by the non-breaching party and the contract continues in full force." *Id.*; *see Henry v. Masson*, 333 S.W.3d 825, 840-41 (Tex.

App.-Houston [1st Dist.] 2010, pet denied); *Hampton v. Minton*, 785 S.W.2d 854, 858 (Tex. App.-Austin 1990, writ denied).

29. MIS cannot reasonably contend that Westlake did not plead the hallmark of repudiation, being MIS's unjustified refusal to perform its obligations under the Agreement, or that the parties did not consent to litigation of an issue central to the parties' dispute. The genesis of this matter was MIS's refusal to perform a covered repair of Westlake's CT recommended by the OEM, Philips. These allegations were asserted throughout litigation of the parties' dispute, including without limitation: (a) Westlake's Responses to Plaintiff's First Set of Interrogatories (CR 253-270); (b) Westlake's Third Party Original Petition (CR 883-888); (c) Westlake's Fourth Supplemental Response to Plaintiff's Request for Disclosure and Expert Designation (CR 2140-2149); and (d) Westlake's Motion for Directed Verdict (CR 2913-2925).

30. The Agreement obligated MIS to maintain Westlake's equipment in accordance with OEM requirements (DX 1 [WLP 193]). At trial, the Jury heard testimony that MIS refused to make an OEM-recommended repair to Westlake's CT and did not service Westlake's equipment after the late-January 2014 "blowup" over the refused repair (RR Hagan v.4, pp.138, 217-19). At the time of the CT incident, Westlake had accepted MIS's payment plan modification and was prepared to continue its performance (DX 24; DX 47; DX 48).

31.     MIS chose a different direction. Mr. Hagan informed the Jury that MIS thereafter determined that it was, in his unequivocal words, through with the relationship: (a) "Nah, we're just done" (RR Hagan, v.4, p.131); (b) "You know, this is it. … we just had it" (RR Hagan, v.4, p.132); (c) "we just need to end it," referring to the Agreement (RR Hagan, v.4, p.122); (d) "We're done" (RR Hagan, v.4, p. 184); and (e) "That's it, we're just done" (RR Hagan, v.4, p. 218). In other words, MIS repudiated performance of its obligations under the Agreement and repudiated the agreed upon payment plan (DX 24; DX 47; DX 48).

32.     There was also evidence at trial that MIS repudiated the parties' contract by refusing to service Westlake's equipment in March 2014, thereby breaching the contract. On March 2, 2014, well into the modified payment plan, Westlake submitted a service report to MIS related to the CT machine at Westlake. (DX 36). The graphics card in the CT had failed and required replacement. Ms. Jefferson followed up the service report submission with an email dated March 3, 2014, in which she asked Mr. Hagan to dispatch an MIS technician to Westlake to repair and replace the graphics card. (DX 35). When MIS failed to do so, Westlake paid Philips to repair the CT and replace graphics card at a cost of $7,836.22. (DX 35).

33.     The repudiation issue in Question No. 3 was present in the litigation since its inception. Evidence was submitted by both parties at trial from which the

Jury could have reasonably concluded that MIS refused continued performance under the Agreement without just cause, excusing Westlake's breach of the Agreement.

## B. RESPONSE TO POINT OF ERROR NO. 4 AND NO. 5

MIS contends that the Trial Court erred in submitting Question No. 3 to the Jury, because there purportedly was neither consideration nor evidence to support Westlake's modification defense. MIS did not raise the lack of consideration issue in the Trial Court, whether orally at trial, in its pleadings, or through its post-trial motions, thereby waiving appellate review of its Point of Error No. 4. *See State of Cal. Dep't of Mental Hygiene v. Bank of Southwest Nat'l Ass'n*, 354 S.W.2d 576, 581 (Tex. 1962). Point of Error No. 5 should be disregarded, because the evidence at trial was sufficient to support the Jury's finding that the Agreement was modified. *See T.O. Stanley Boot Co., Inc. v. El Paso*, 847 S.W.2d 218, 221 (Tex. 1992).[5]

34. MIS contends that consideration supporting a contract modification must be "separate and apart from the consideration from the initial contract."

---

[5] Throughout its brief, and especially in Points of Error No. 4 through No. 6, MIS attempts to equate the Jury's response to Question No. 3 as the Jury's absolution of Westlake's obligation to make payment under the Agreement. Question No. 3 merely asked the Jury to determine, "Was Westlake's failure to comply [with the terms of the Agreement] excused?" (CR 2993). In other words, was Westlake's breach of the Agreement, as found by the Jury in Question No. 1, excused? The Jury found that Westlake's breach was excused. Subsequent Jury questions, addressing the parties' damages on competing breach claims, and evidence before the Jury explain the take-nothing verdict. *See* discussion, *infra*, ¶ 50. However, MIS's appeal is limited solely to Question No. 3.

Appellant Br. at 23, ¶ 44 (citing *Kellogg Brown & Root Int'l, Inc. v. Altanmia Commercial Mktg. Co. W.L.L.*, No. H-07-2684, 2008 WL 5114962, at *17 (S.D. Tex. Dec. 3, 2008, not reported in F.Supp.2d)). The *Kellogg* court actually states, "A valid contract modification must be supported by consideration separate from the consideration of the initial contract. Consideration may consist of a benefit to one party or a detriment to the other party." *Kellogg*, 2008 WL 5114962, at *17. Under this consideration principle, the parties' modification of the Agreement was supported by consideration.

35. Under the original Agreement, MIS was not entitled to receive weekly payments from Westlake, and Westlake was not entitled to make payments on 60-day payment terms. This exchange of benefit and detriment between the parties, offered by MIS and accepted by Westlake, was consideration for the modification to the Agreement. *See Okemah Constr., Inc. v. Barkley-Farmer, Inc.*, 583 S.W.2d 458, 460 (Tex. App.-Houston [1st Dist.] 1979, no writ) (noting that to give effect to a modification, "it must have been offered by one party and accepted by the other").

36. MIS contends that Westlake did not agree to a modification of the Agreement, but its contention is focused on incompetent opinion evidence from fact witnesses and general obfuscation of the material evidence in the record. As summarized above, between December 2013 and January 2014, MIS extended 60-day payment terms to Westlake, with the last such offer accompanied by a payment

plan obligating Westlake to make weekly payments to MIS of approximately $5,500 (exceeding the $16,729 otherwise owed under the Agreement by over $5,000 per month). This offer was made by Mr. Hagan in an email communication dated January 16, 2014 (DX 24), and it was accepted in an email communication from MIS dated January 21, 2014 (DX 24). Thereafter, Westlake performed the modified Agreement, making the weekly payments (DX 35; DX 47; DX 48), and MIS accepted them without objection. *See Okemah Constr.*, 583 S.W.2d at 460 (noting that a modification requires "a meeting of minds"); *United Concrete Pipe Corp. v. Spin-Line Co.*, 430 S.W.2d 360, 364 (Tex. 1968) (noting "performance of that act which the offeree was requested to promise to perform may constitute a valid acceptance").

37. Whether: (a) Ms. Jefferson was of the opinion that the Agreement had been modified, or (b) anyone from Westlake signed the document attached to Mr. Hagan's January 16 email, is irrelevant to the modification issue. The exhibits cited above were admitted into evidence and available for Jury consideration of the modification defense in Question No. 3. These exhibits evince MIS's offer to modify the Agreement, Westlake's acceptance of the offer, and Westlake's performance of the modified Agreement. The Jury heard testimony from MIS's expert that, during the period prior to MIS's default notice, Westlake's purported delinquency was within the 60-day payment terms of the modified Agreement (RR Erickson, v.8, pp.

153-54, 159-61, 163, 165-67, 172-73, 175-76). Accordingly, the trial record contains evidence sufficient to support the Jury's conclusion that the Agreement was modified.

## C.     RESPONSE TO POINT OF ERROR NO. 6

The Trial Court did not err in submitting Westlake's waiver defense to the Jury as part of Question No. 3. The trial record contains sufficient evidence from which the Jury could have concluded that MIS waived portions of the Agreement, excusing Westlake's breach. In its prior challenges to the waiver defense, MIS focused exclusively on Paragraph T of the Agreement, which it contended required the assent of both parties to affect a waiver of any provision of the Agreement (CR 3036-3045; RR Shelton, v.9, pp.116-17).[6] MIS has abandoned its objections made in the Trial Court in favor of entirely new arguments not raised below. *See Larsen v. FDIC/Manager Fund*, 835 S.W.2d 66, 74 (Tex. 1992) (noting inability of court of appeals to reverse based on new argument raised for first time on appeal).

38.     "[W]aiver is essentially unilateral in its character; … no act of the party in whose favor it was made is necessary to complete it." *Massachusetts Bonding & Ins. Co. v. Orkin Exterminating Co.*, 416 S.W.2d 396, 401 (Tex. 1967). Waiver may

---

[6]    The plain language of the Agreement (and the extant authority cited herein) recognizes waiver as MIS's unilateral act: "No waiver, alteration or modification of any of the provisions hereof shall be binding upon MIS unless in writing and signed on its behalf by MIS Executive Officers" (DX 1 [WLP 1]).

be an express renunciation of a right, or it may arise from a party's silence or inaction over a period of time. *Interceramic, Inc. v. South Orient R.R. Co., Ltd.*, 999 S.W.2d 920, 926 (Tex. App.-Texarkana 1999, pet. denied).

39. Texas law recognizes an "implied waiver of the requirement of punctual payments by acceptance of payments made past the due date." *Bodiford v. Parker*, 651 S.W.2d 338, 339 (Tex. App.-Fort Worth 1983, no writ). This implied waiver limits the ability of a party to declare default based on untimely payments, without prior advanced notice to the payor. *See McGowan v. Pasol*, 605 S.W.2d 728, 732 (Tex.App-Corpus Christi 1980, no writ).

40. Where reasonable minds could differ on the issue of waiver, the jury resolves the question of fact. *See Crosstex Energy Servs., L.P. v. ProPlus, Inc.*, 430S.W.3d 384, 394 (Tex. 2014); *G.H. Bass & Co. v. Dalsan Properties-Abliene*, 885 S.W.2d 572, 578 (Tex. App.-Dallas 1994, no writ).[7]

41. The evidence proffered at trial was undisputed that MIS had accepted late payments from Westlake on numerous occasions throughout the term of the Agreement. In fact, MIS concedes that it accepted late payments from Westlake from

---

[7] MIS cites the *G.H. Bass* case for the proposition that waiver—like most issue reserved for jury determination—is difficult to prove as a matter of law. Appellant Br. at 29, ¶ 57. The *G.H. Bass* case involved a motion for summary judgment and the moving party's request to find waiver as a matter of law. The same is true for *Global Financial Services* (2008 WL 372521) case, the *Vessels* (823 S.W.2d 762) case, and the *Bancoklahoma* (641 S.W.2d 400) cases cited in Point of Error No. 6, all of which sought a determination of waiver as a matter of law. *See* Appellant Br. at 30, ¶ 61. However, Westlake has not asserted that it was entitled to a finding of waiver as a matter of law and the waiver issue was not decided by the Trial Court as a matter of law.

the commencement of the parties' relationship under the Agreement in early 2011. *See* Appellant Br. at 4, ¶ 4. The payment terms in the Agreement provided, "Each Monthly Payment Shall [*sic*] be due upon the 1st of each month .... Any payment not received After [*sic*] the 5th of the month will be considered delinquent and will accrue interest at the rate of 1.5% per month until paid in full" and be considered an event of default (DX 1 [WLP 195]). MIS did not charge Westlake interest during the term of the Agreement. MIS did not declare the Agreement in default until after the January 2014 "blowup" over its refusal to make the OEM-recommended repair to Westlake's CT (RR Hagan, v.4, pp.217-19; RR Bates, v.7, p.92; DX 34).

42.     On multiple occasions, MIS expressly informed Westlake that it would be in compliance with its obligations under the Agreement, if it maintained payment terms of 60-days. Mr. Hagan renunciated the payment term provision of Agreement in his December 17, 2013, email communication informing Westlake that 60-day payment terms were acceptable (DX 21). Vivian Bates, the MIS CFO, expressly waived the payment term provision in her correspondence of December 23, 2013, again informing Westlake that 60-day payment terms were acceptable (DX 23). Finally, Mr. Hagan's email of January 16, 2014, informed Westlake that it was relieved of the payment term provision of the Agreement so long as it stayed within the 60-day window (DX 24).

43. Westlake was not on the verge of default during these periods as claimed by MIS. Instead, the Jury heard Mr. Hagan testify that MIS had a good and valued relationship with Westlake during this period (DX 14; DX 24). During the period between Mr. Hagan's January 2016 email and Ms. Bates' March 2014 default notice demanding 10-day payment terms, MIS never informed Westlake that its late payment of any amount owed under the Agreement would result in Westlake's default of the Agreement. *Cf. McGowan*, 605 S.W.2d at 732.

44. Under the facts, the Jury could have reasonably determined that MIS waived the payment term provision of the Agreement, which MIS claims was the Westlake's breach of the Agreement. *See* Appellant Br. at 4, ¶ 4. The evidence before the Jury demonstrated that MIS accepted late payments under the Agreement from the beginning of the Agreement. The evidence also demonstrated that MIS expressly relieved Westlake from the payment terms in the Agreement. Accordingly, the Trial Court did not err in submitting the waiver issue to the Jury in Question No. 3.

## D. RESPONSE TO POINT OF ERROR NO. 1

The Trial Court did not err in submitting a broad-form issue on Question No. 3. As demonstrated above, each of the issues included in Question No. 3 were supported by the pleadings and the evidence proffered during trial. The Jury could have reasonably concluded that MIS modified and/or waived provisions of the Agreement or repudiated it by refusing to service Westlake's equipment without

justification. Accordingly, nothing in Question No. 3 "probably caused the rendition of an improper judgment" in the Trial Court, requiring reversal of the take-nothing Judgment. TEX. R. APP. P. 61.1(a); *see Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 754 (Tex. 2006) (finding harmless error where record does not support probable improper judgment).

45.　"[T]he trial court's duty is to submit only those questions, instructions, and definitions raised by the pleadings and the evidence." *Harris County v. Smith*, 96 S.W.3d 230, 236 (Tex. 2002); *see* TEX. R. CIV. P. 278. Consistent with applicable law, *see* TEX. R. CIV. P. 277, the trial court exercises this duty through a "fundamental commitment to broad-form submission," as was employed by the Trial Court in the proceedings below. *Harris County*, 96 S.W.3d at 235. As forecasted by the *Harris* court, MIS has used the broad-form submission to complain about "potential" errors in the charge submitted to the Jury. *See id*. at 235. The purpose of the broad-form submission is to simplify the charge process and "provide more comprehensible questions for the jury." *Id*. However, MIS's contention "that such a simple instruction will 'nudge' jurors toward a defense verdict reflects a very low opinion of their intelligence. … [T]hey are not cattle who will be stampeded to an improper verdict by something like this." *Urista*, 211 S.W.3d at 760 (Medina, J., dissenting).

46.     Nonetheless, MIS contends that Question No. 3 was a presumptive reversible error under the rule set forth in *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000). *See Casteel*, 22 S.W.3d at 388. Under *Casteel*, reversible error arises only in such cases that "the appellate court cannot determine whether the jury based its verdict on an invalid theory." *Harris County*, 96 S.W.3d at 233. "*Casteel* issues do not arise in every situation where a jury has more than one legal theory to choose from when answering a single question." *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 621 (Tex. 2014); *see Thota v. Young*, 366 S.W.3d 678 (Tex. 2012) (declining to extend scope of *Casteel* rule to defensive theory of contributory negligence).

47.     For reversible error, the "invalid theory" must be the "'sole basis for the jury's finding.'" *Urista*, 21 S.W.3d at 756 (quoting *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 389 (Tex. 2000)); *see El Paso Refining, Inc. v. Scurlock Permian Corp.*, 77 S.W.3d 374, 386 (Tex. App.-El Paso 2002, pet. denied) (noting "remand is only required when a theory should never has been presented to the jury because there was no valid *legal*, as opposed to *factual*, basis for the submission"). Absent such a finding, the appellate court is to "apply traditional harmless error analysis." *Urista*, 21 S.W.3d at 757. Under the traditional analysis, reversal is required "only if [the jury instruction] 'was reasonably calculated to and probably

did cause the rendition of an improper judgment.'" *Id.* (quoting *Reinhart v. Young*, 906 S.W.2d 471, 473 (Tex. 1995)).

48. Each of the issues included in Question No. 3 was legally valid, within the scope of Westlake's pleadings, and supported by competent evidence. MIS has never argued that repudiation, modification, or waiver[8] are legally invalid theories. MIS's objection at trial to the repudiation was limited to its contention that the issue was purportedly outside the scope of Westlake's pleadings (RR Shelton, v. 9, p.115). MIS did not expressly object to the modification and waiver issues, incidentally referring to them during argument in support of its broad "excuse" objection (RR Shelton, v. 9, p.116). Similarly, MIS did not challenge the legal validity of any of the Question No. 3 issues (or mention any purported *Casteel* issue) in its post-trial motion, requesting a new trial (CR 3102-3111). The circumstances do not support a presumptive reversible error under *Casteel*.

49. The traditional error analysis likewise does support a finding of reversible error. Question No. 3 was submitted to the Jury based on issues raised in Westlake's pleadings and supported by the evidence and, thus, was properly submitted to the Jury within the Trial Court's discretion. The record does not contain any support for the (unasserted) contention that Question No. 3 was reasonably calculated to result in an improper verdict or judgment.

---

[8] MIS proposed waiver instructions applicable to both itself and Westlake (CR 2250, 2262).

50. The Jury's ultimate determination, resulting in the take-nothing Judgment, is supported by the evidence unaided by speculation.[9] The jury found that MIS breached its obligations under the Agreement (CR 2992). Westlake submitted evidence of its damages of approximately $368,000 (DX 55), incurred because of MIS's refusal to perform its obligations under the Agreement after the x-ray tube issue. The Jury found that Westlake did not comply with the Agreement, but that the breach was excused (CR 2992-2993). At trial, MIS's economics expert testified that MIS's total damages were in the range of approximately $310,000 (RR Erickson, v.8, pp.111-14) to $429,000 (RR Erickson, v.8, pp. 89-90),[10] which represented amounts purportedly owed at the time MIS commenced litigation through expiration of the 5-year term of the Agreement. The Jury could have reasonably concluded, as it did (CR 2995, 2996), that the parties' damages were an offsetting wash, with

---

[9] In paragraphs 24 and 25 of its brief, MIS asks the Court to speculate regarding the significance of an inquiry made by the Jury regarding its answer to Question No. 3 (CR 2987). MIS suggests that this inquiry is evidence of an improper basis for the Jury's verdict. Question No. 3 contained four issues: repudiation, modification, waiver, and fraud. The Jury determined that MIS did not defraud Westlake. The less speculative explanation of the Jury's inquiry is that it was trying to determine whether it could answer Questions No. 3 in the affirmative, if it found that the fraud issue was not supported by the evidence.

[10] The midpoint between the expert's (disputed) damages estimates is $369,500.

neither party entitled to damages from the other.[11] Accordingly, Question No. 3 did not result in an improper judgment.

## V.    CONCLUSION AND PRAYER

MIS did not preserve the six putative errors for which it seeks appellate review. MIS's arguments in support of these contentions were not raised in the Trial Court and should not be considered for the first time on appeal. Ignoring the procedural deficiencies, MIS's points of appeal are without merit. Each of the issues included in Question No. 3 were legally sufficient excuses of Westlake's non-performance under the Agreement. Based on the evidence at trial, the Jury could have reasonably concluded that MIS repudiated performance of its obligations under the Agreement after modifying and waiving the payment term provision of the Agreement. Thus, the Jury's finding in Question No. 3 does not amount to a reversible error.

WHEREFORE, Appellees, Westlake Surgical, LP d/b/a The Hospital at Westlake Medical Center and WS GP, LLC, request this Court to AFFIRM the Judgment of the Trial Court and to grant Appellees such other relief to which they may be justly entitled.

---

[11] Notwithstanding its challenge on Question No. 3, MIS's complaint appears to be that it was not awarded damages by the Jury. *See* Appellant Br. at 33, ¶ 68 (requesting remand only on issue of damages and attorney fees). MIS submitted its own proposed jury instructions and questions (CR 2232-2263), including instructions on its purported damages (CR 2238-2243). MIS has not appealed the Trial Court's exclusion of these damages instructions.

Respectfully submitted,

By: */s/ David L. Bryant*
David L. Bryant
State Bar No. 24084344
*dbryant@gablelaw.com*
GABLEGOTWALS
113 Pleasant Valley Drive, Suite 204
Boerne, TX 78006
(830) 336-4810
(918) 595-4990 (facsimile)

AND

R. Chad Geisler
State Bar No. 00793793
*cgeisler@germer-austin.com*
GERMER BEAMAN & BROWN, LLC
301 Congress Avenue, Suite 1700
Austin, TX 78701
(512) 472-0288
(512) 472-0721 (facsimile)

ATTORNEYS FOR APPELLEES
WESTLAKE SUGICAL, LP D/B/A THE
HOSPITAL AT WESTLAKE MEDICAL
CENTER AND WS GP, LLC

## CERTIFICATE OF COMPLIANCE

I certify that this document was produced on a computer using Microsoft Word and contains 8,465 words as determined by the computer software's word-count function, including all sections, even those that may be excluded according to TEX. R. APP. P. 9.4(i)(1).

By: */s/ David L. Bryant*

## CERTIFICATE OF SERVICE

I certify that on this 25th day of September, 2017, I forwarded a true and correct copy of the foregoing document to all parties listed below:

**VIA EFILE**
Mr. Craig L. White
Craig L. White, P.C.
111 West Olmos Drive
San Antonio, Texas 78212

**VIA EFILE**
Mr. R. Chad Geisler
Germer Beaman & Brown, PLLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701

**VIA EFILE**
Mr. Jay M. Rosenberg
Conley Rosenberg & Mendez
5080 Spectrum Drive, Suite 850 E
Addison, TX 75001

**VIA EFILE**
Wade B. Shelton
Shelton & Valadez
600 Navarro Street, Suite 500
San Antonio, Texas 78205

By: */s/ David L. Bryant*